1   Hassan A. Zavareei (C.A. Bar No.181547)
    TYCKO & ZAVAREEI LLP
2   2000 L Street, N.W., Suite 808
    Washington, D.C. 20036
3   Tel: (202) 973-0900
    Fax: (202) 973-0950
4   hzavareei@tzlegal.com
5
    Attorneys for Plaintiff, Amber Hawthorne
6

**BY FAX**

**E-filing**

7

8                **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                    **SAN FRANCISCO DIVISION**

11

12   **AMBER HAWTHORNE,** on Behalf of
     Herself and All Others similarly situated,        **CV11** No. **6700**
13
                   Plaintiff,
14                                                      CIVIL Action No.
     v.                                                **CLASS ACTION COMPLAINT**
15
     **UMPQUA BANK,**                                   **JURY TRIAL DEMANDED**
16
                   Defendant.
17

18

19                          **COMPLAINT – CLASS ACTION**

20        Plaintiff, Amber Hawthorne, through undersigned counsel, on behalf of herself and all

21   persons similarly situated, allege the following based on personal knowledge as to allegations

22   regarding the Plaintiff and on information and belief as to other allegations.

23                                **INTRODUCTION**

24        1.        This is a civil action seeking monetary damages, restitution, and declaratory

25   relief from Defendant, Umpqua Bank, ("Umpqua" or the "Bank"), arising from its unfair and

26   unconscionable assessment and collection of excessive overdraft fees.

27        2.        In the era of electronic banking and the ubiquitous use of debit card transactions,

28   the assessment of overdraft fees has become a major profit center for many United States banks,

     COMPLAINT                           -1-

1   including Umpqua. For years, banks covered customers who occasionally bounced checks and even
2   did so for a time for customers using debit cards, without charging their customers. Since the early
3   1990's, however, banks have devised methods to provide overdraft "protection" for customers and
4   charge them in each instance. A recent FDIC report estimated that overdraft fees represent 74
5   percent of the total service charges that are imposed on deposit accounts in the United States. A
6   2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest
7   rate that *exceeds 3,500 percent*.

8       3.       In 2009, banks brought in $37.1 billion in overdraft charges alone. Operating
9   186 banking locations across California, Washington, Oregon, and Nevada, Umpqua benefits
10  greatly from these staggering charges.

11      4.       Almost by definition, these fees disproportionately affect the poor, who are most
12  likely to maintain low checking account balances. Moreover, these fees have the tendency to create
13  a domino effect, because the imposition of a service charge on an account with a negative balance
14  will make it less likely that the account holder's balance will reach positive territory, resulting in
15  more fees.

16      5.       Umpqua in many cases charges overdraft fees improperly and without cause, and
17  charges overdraft fees for transactions which did not actually overdraw an account. Umpqua uses
18  various unlawful devices to cause accountholders to incur so-called "overdraft fees" for purchases
19  that did not actually overdraw their accounts. One device (but not the only one) Umpqua uses to
20  charge overdraft fees when an account had not been "over-drafted" is the reordering of debit card
21  transactions from highest dollar amount to lowest dollar amount. Without disclosing to its
22  customers that it does so, and without even indicating on it bank statements that it does so, Umpqua
23  takes transactions out of the order they were actually initiated by customers, and posts them from
24  the most expensive purchase to the least expensive purchase. This has the effect of rapidly
25  depleting an account balance, causing accountholder to incur more overdraft fees on smaller
26  purchases than they otherwise would have. Umpqua does this in bad faith, and solely to maximize
27  overdraft fee revenue.

28

COMPLAINT                    -2-

6.      Umpqua could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions. Retail and service transactions could still be executed if consumers presented an alternative form of payment. ATM transactions could still proceed if Umpqua provided a warning that an overdraft fee would be assessed, and customers chose to proceed nevertheless. In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

7.      Instead of simply declining debit transactions when there are insufficient funds, or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, Umpqua routinely processes such transactions and then charges its customers an overdraft fee of $35.00—even when the transaction is for only a few dollars. This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for Umpqua. Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, Umpqua failed to adequately disclose to its customers that they could elect to opt out of overdraft protection.

8.      In many instances, these overdraft fees cost Umpqua account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars. Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

9.      Thus, it is through manipulation and alteration of customers' transaction records that Umpqua maximizes overdraft penalties imposed on customers.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action in which some members of the classes are citizens of states different than Defendant. *See* 28 U.S.C. § 1332(d)(2)(A).

COMPLAINT            -3-

1      11.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391 and California

2   Code of Civil Procedure § 395, because the Bank has numerous branches in this district and has

3   imposed substantial overdraft fees on consumers who hold accounts in this district.

4      12.     Intradistrict Assignment pursuant to Civil L.R. 3-2(c). This action is properly

5   assigned to the San Francisco Division or Oakland Division of this Court because a substantial part

6   of the events or omissions which give rise to the claim occurred in Contra Costa, Humboldt, Lake,

7   Mendocino, Napa, and Sonoma counties.

8

9                               **THE PARTIES**

10     13.     Plaintiff, Amber Hawthorne, is a resident of the State of California.

11     14.     Umpqua is a national bank and maintains its principal place of business at 445

12  S.E. Main Street, Roseburg, Oregon 97470.   Among other things, Umpqua is engaged in the

13  business of providing retail banking services to millions of consumers, including Plaintiff and

14  members of the putative classes, which include the issuance of debit cards for use by its customers

15  in conjunction with their checking accounts. Umpqua has over $11 billion in assets and operates

16  186 branches in California, Nevada, Oregon, and Washington.

17

18                            **CLASS ALLEGATIONS**

19     15.     Plaintiff brings this action on behalf of herself and all others similarly situated

20  pursuant to Fed. R. Civ. P. 23.   This action satisfies the numerosity, commonality, typicality,

21  adequacy, predominance and superiority requirements of Rule 23.

22     16.     The proposed classes are defined as:

23

24

25

26

27

28

COMPLAINT                              -4-

All Umpqua customers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of Umpqua's practice of re-sequencing debit card transactions from highest to lowest dollar amount (the "National Class").

All Umpqua customers having accounts at branches in the state of California for the purpose of asserting claims under California's Unfair Competition Law, Cal. Bus & Prof. Code § 17200, *et seq.* (the "California State Subclass) (*see* Fifth Claim for Relief, *infra*).

The National Class and the California State Subclass are collectively referred to as the "Classes."

17.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

18.     Excluded from the Classes are Umpqua, its parents, subsidiaries, affiliates, officers and directors, any entity in which Umpqua has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

19.     The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Umpqua's records.

20.     The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all Class members, was charged overdraft fees by Umpqua as a result of its practice of re-sequencing debit card transactions from highest to lowest. The representative Plaintiff, like all Class members, has been damaged by Umpqua's misconduct in that she has been assessed and/or will continue to be assessed unfair and unconscionable overdraft charges. Furthermore, the factual basis of Umpqua's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

21.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

22.     Among the questions of law and fact common to the Classes are whether Umpqua:

1         a.       Did not clearly disclose and/or refused to allow its customers to opt

2 out of its overdraft protection program;

3         b.       Did not obtain affirmative consent from its customers prior to

4 processing transactions that would result in overdraft fees;

5         c.       Does not alert its customers that a debit card transaction will trigger

6 an overdraft fee, and does not provide its customers with an opportunity to cancel such transactions;

7         d.       Manipulates and reorders transactions so that it can increase the

8 number of overdraft fees it imposes;

9         e.       Manipulates and reorders debits from highest to lowest in order to

10 maximize the number of overdrafts and, consequently, the amount of overdraft fees;

11         f.       Imposes overdrafts and overdraft fees when, but for reordering

12 transactions, there would otherwise be sufficient funds in the accounts;

13         g.       Fails to provide customers with accurate balance information;

14         h.       Delays posting of transactions by customers using debit cards so that

15 customers are charged overdraft fees on transactions, even though the customers had sufficient

16 funds in their accounts to cover the transactions upon execution;

17         i.       Breaches its covenant of good faith and fair dealing with Plaintiff and

18 other members of the Classes through its overdraft policies and practices;

19         j.       Requires its customers to enter into standardized account agreements

20 which include unconscionable provisions;

21         k.       Converts money belonging to Plaintiff and other members of the

22 Classes through its overdraft policies and practices;

23         l.       Is unjustly enriched through its overdraft policies and practices; and

24         m.       Violates the consumer protection acts of certain states through its

25 overdraft policies and practices.

26     23.       Other questions of law and fact common to the Classes include:

27         a.       The proper method or methods by which to measure damages, and

28         b.       The declaratory relief to which the Classes are entitled.

1    24.    Plaintiff's claims are typical of the claims of other Class members, in that they
2  arise out of the same wrongful overdraft policies and practices and the same or substantially similar
3  unconscionable provisions of Umpqua's account agreements and other related documents. Plaintiff
4  has suffered the harm alleged and has no interests antagonistic to the interests of any other Class
5  member.

6    25.    Plaintiff is committed to the vigorous prosecution of this action and has retained
7  competent counsel experienced in the prosecution of class actions and, in particular, class actions on
8  behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate
9  representative and will fairly and adequately protect the interests of the Classes.

10    26.    A class action is superior to other available methods for the fair and efficient
11  adjudication of this controversy. Since the amount of each individual Class member's claim is
12  small relative to the complexity of the litigation, and due to the financial resources of Umpqua, no
13  Class member could afford to seek legal redress individually for the claims alleged herein.
14  Therefore, absent a class action, the Class members will continue to suffer losses and Umpqua's
15  misconduct will proceed without remedy.

16    27.    Even if Class members themselves could afford such individual litigation, the
17  court system could not. Given the complex legal and factual issues involved, individualized
18  litigation would significantly increase the delay and expense to all parties and to the Court.
19  Individualized litigation would also create the potential for inconsistent or contradictory rulings. By
20  contrast, a class action presents far fewer management difficulties, allows claims to be heard which
21  might otherwise go unheard because of the relative expense of bringing individual lawsuits, and
22  provides the benefits of adjudication, economies of scale and comprehensive supervision by a single
23  court.

24

25                    **COMMON FACTUAL ALLEGATIONS**

26    **A.    Umpqua**

27    28.    Umpqua is in the business of providing its customers with a variety of banking
28  services. One of the services provided by Umpqua for customers who open a checking account is a

COMPLAINT                    -7-

1    debit card, also known as a check card or ATM card. Through those debit cards, customers can
2    engage in transactions using funds directly from their accounts by engaging in "debit" or "point of
3    sale" ("POS") transactions, or may withdraw money from their accounts at automated teller
4    machines ("ATMs"). Whether the card is used to execute POS transactions or to withdraw cash
5    from ATMs, the transaction is processed electronically. As a result, Umpqua is notified
6    instantaneously when the card is swiped, and has the option to accept or decline transactions at such
7    time.

8        29.      Umpqua employs sophisticated software to automate its overdraft system. This
9    program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per
10   customer.

11       30.      As a result of Umpqua's manipulation and alteration of customers' transaction
12   records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely
13   to be charged for multiple smaller transactions. Indeed, overdraft charges are likely to occur at
14   times when, but for the manipulation and alteration, there would be funds in the account and no
15   overdraft would occur. For example, if a customer, whose account has a $50 balance at the time
16   Umpqua processed several transactions. made four transactions of $10 and one subsequent
17   transaction of $100 on the same day, the Bank would reorder the debits from largest to smallest,
18   imposing five overdraft fees on the customer. Conversely, if the $100 transaction was debited last –
19   consistent with the actual order of transactions – only one overdraft fee would be assessed.

20   **B.        Umpqua's Relevant Customer Documents Regarding Overdrafts**

21       31.      Plaintiff and all members of the Classes maintain or maintained a checking
22   account with Umpqua. The terms of Umpqua's checking accounts are contained in standardized
23   account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and
24   imposed by Umpqua, which was the party of vastly superior bargaining strength, and thus constitute
25   agreements of adhesion. A representative copy of Umpqua's single page "Overdraft Disclosure" is
26   attached as Exhibit A. The Overdraft Disclosure states:

27       If there are funds to cover some but not all of the checks, withdrawals or other
         debits (such as charges) posting to your account, we may pay these items, for
28       which there are funds, *in any order we may choose at our sole discretion*.

COMPLAINT                          -8-

1    Exh. A (emphasis added).

2        32.    In addition, the Overdraft Disclosure states that "[i]f an item is presented without
3    sufficient funds in your account to pay it, *we may, at our discretion*, pay the item (creating an
4    overdraft) or return the item (NSF)." *Id.* The Account Agreement also states that "You understand
5    that *we may, at our discretion*, honor withdrawal requests that overdraw your account. However,
6    the fact that we may honor withdrawal request that overdraw the account balance does not obligate
7    us to do so later" *Id.* (emphases added).

8        33.    Accordingly, its Overdraft Disclosure, Umpqua reserved for itself huge amounts
9    of discretion, at every stage of the process. Umpqua reserved for itself discretion as to when to post
10   a debit card transaction, whether to post a debit card transaction, and how to post a debit card
11   transaction. It thus had every available lever in its hands to maximize overdraft fees, and maximize
12   it did. Umpqua abused that discretion, in bad faith, with bad motive, and in violation of the
13   covenant of good faith and fair dealing. It intentionally manipulated the order of transactions—
14   taking them out of their natural, chronological, order, and posting them in the order of highest to
15   lowest, in order to maximize fees, all while hiding this manipulation from its customers.

16       34.    Umpqua's Overdraft Disclosure fails to inform customers of crucial aspects of
17   Umpqua's overdraft policies, including that Umpqua used a high-to-low posting order—which has
18   an important and indeed decisive impact on the number of overdraft fees charged.

19       35.    A representative copy of Umpqua's Terms and Conditions of Your Account (the
20   "Account Agreement") is attached as Exhibit B. Remarkably, the Account Agreement terms are
21   inconsistent with the Overdraft Disclosure, in which Umpqua states that it will pay transactions "in
22   any order we may choose." The fine print of the Account Agreement falsely states that the bank can
23   order the transactions any way it pleases, and then states that "items" will paid in a high-to-low
24   order:

25       The law permits us to pay items drawn on your account in any order . . . To assist
         you in handling your account with us, we are providing you with the following
26       information regarding how we process those items . . . When processing checks or
         orders drawn on your account, our policy is to pay them according to the dollar
27       amount. We pay the largest dollar items first by transaction type.

28

COMPLAINT                    -9-

1    If smallest items are paid first, you may have fewer NSF or overdraft fees, but the
     largest, and perhaps more important items (such as rent or mortgage payments) might
2    not be paid. However, if the largest items are paid first, your most important items
     might be paid but it may increase the overdraft or NSF fees if funds are not available
3    to pay all of the items.

4    Exh. B, at 3.

5        36.        Most misleadingly, these Account Agreement terms are inconsistent with the

6    monthly bank statements issued by Umpqua, on which smaller dollars items—not larger dollar

7    items—are shown as being paid first. The monthly statements are the documents that customers

8    regularly consult and rely on to keep track of their checking account. Yet, when an Umpqua

9    customer views his or her account statement, they are looking a total fabrication, which makes it

10   appear (falsely) that the overdrafts are being ordered from low-to-high.

11       37.        These Account Agreement terms are also inconsistent with Umpqua's actual

12   practice because they indicate that overdraft fees will be charged only on transactions that over-draft

13   an account or "when funds are not available to pay all of the items." In fact, this is not the case, and

14   Umpqua charges overdraft fees even on transactions that are initiated at a time the account does

15   contain funds "available to pay all of the items." Exh. B, at 3.

16       38.        In addition, the Account Agreement fails to state that the Bank groups together

17   debit card transactions that occurred on subsequent days with debit card transactions that occurred

18   on earlier days, and reorders them so that higher debits that occurred on subsequent days are posted

19   to its customers' accounts before lower debits that occurred on earlier days. In addition, the

20   Account Agreement fails to give the period of time in which the Bank process and reorders batches

21   of transactions. Thus, the Account Agreement is deceptive and/or unfair because the Bank groups

22   together debit card transactions that occurred on subsequent days with debit card transactions that

23   occurred on earlier days, and reorders them so that higher debits that occurred on subsequent days

24   are posted to its customers' accounts before lower debits that occurred on earlier days, contrary to

25   the terms of the Bank's Account Agreement and its customers' reasonable expectations.

26       39.        Neither the Account Agreement nor the Overdraft Disclosure divulge that

27   Umpqua's often holds transactions, sometimes for days on end, before "drawing" those transactions

28   on an account.

COMPLAINT                          -10-

1       40.     Umpqua also never disclosed the order in which different "transaction types" are

2 posted. Indeed, Umpqua chose to post certain "transaction types" before others in order to

3 maximize overdraft fee revenues, without disclosing this to customers.

4       41.     Umpqua actively misleads accountholders by stating that "[i]f the smallest items

5 are paid first, you may have fewer NSF or overdraft fees, but the largest, and perhaps more

6 important items (such as rent or mortgage payments) might not be paid. However, if the largest

7 items are paid first, your most important items might be paid but it may increase the overdraft or

8 NSF fees if funds are not available to pay all of the items." Exh. A, at 3. First, upon information

9 and belief, the vast majority of transactions which drive Umpqua checking accounts into a negative

10 balance for purposes of assessing overdraft fees are not "important" transactions like mortgages, but

11 rather everyday, relatively small-dollar debit card purchases. Second, Umpqua's purported

12 disclosure leads customers to believe that the Bank's decision to create an overdraft is made on a

13 case by case basis and depends on the "importance" of a certain transactions. In reality, Umpqua's

14 actual practice and policy is to uniformly and automatically create overdrafts for the purpose of

15 maximizing overdraft fee revenue, without regard or evaluation of the relative "importance" of

16 transactions.

17       **C.**     **Umpqua's Re-Ordering of Checking Account Transactions**

18       42.     In an effort to maximize overdraft revenue, Umpqua manipulates and reorders

19 debits from highest to lowest during given periods of time. Umpqua reorders transactions for no

20 reason other than to increase the number of overdraft fees it can charge. This practice breaches the

21 contract between the Bank and its accountholders and violates the covenant of good faith and fair

22 dealing.

23       43.     In addition, the Account Agreement fails to state that the Bank groups together

24 debit card transactions that occurred on subsequent days with debit card transactions that occurred

25 on earlier days, and reorders them so that higher debits that occurred on subsequent days are posted

26 to its customers' accounts before lower debits that occurred on earlier days. In addition, the

27 Account Agreement fails to give the period of time in which the Bank process and reorders batches

28 of transactions. Thus, the Account Agreement is deceptive and/or unfair because the Bank groups

COMPLAINT           -11-

1  together debit card transactions that occurred on subsequent days with debit card transactions that
2  occurred on earlier days, and reorders them so that higher debits that occurred on subsequent days
3  are posted to its customers' accounts before lower debits that occurred on earlier days, contrary to
4  the terms of the Bank's Account Agreement and its customers' reasonable expectations.

5      44.    The Bank's practices thus violate the contract and the covenant of good faith and
6  fair dealing implied in the Bank's Account Agreement as well as the consumer protection laws of
7  certain states.

8      45.    Umpqua misleads its customers regarding its reordering practice by providing its
9  customers with deceptive account statements that show debit transactions posted from lowest to
10  highest dollar value when, in reality, the transactions are being posted from highest to lowest dollar
11  value. In order to further the deceptive scheme, Umpqua does not provide a running balance on
12  customers' statements, and thus, customers are unable see the discrepancy between the order in
13  which the transactions are listed on their statements and the order in which the Bank actually
14  processes the transactions.

15      46.    As such, the monthly account statements are designed to cloak Umpqua's true
16  policies and do not provide a reasonable method for customers to follow the daily activity in their
17  accounts as used by Umpqua for applying fees. As a result, accountholders cannot easily determine
18  why an overdraft fee was charged or what transaction the charge relates to—or even that Umpqua
19  uses the high to low reordering practice at all. The Bank thus prevents its customers from
20  determining the cause of overdraft fees and deceptively and misleadingly hides its unfair overdraft
21  policies and procedures.

22      47.    Transactions involving debit cards used by Umpqua customers, including the
23  withdrawal of cash from ATM machines and point of sale transactions with vendors, are processed
24  electronically. As a result, on information and belief, Umpqua is notified instantaneously when a
25  transaction occurs.   Notwithstanding the instantaneous nature of these electronic debit card
26  transactions, Umpqua fails to post charges in the order in which they are authorized or received.
27  Instead of processing such transactions in chronological order, Umpqua processes them starting
28

COMPLAINT                    -12-

1 with the largest debit and ending with the smallest debit. On information and belief, Umpqua
2 follows this policy to maximize the number of overdraft fees charged to customers.

3     48. Umpqua's practices ensure that smaller charges will result in multiple overdraft
4 fees. On information and belief, the Bank's policy is specifically designed to maximize the
5 generation of overdraft fees by triggering overdraft fees for account charges that would not
6 otherwise result in such fees.

7     49. As a result, Plaintiff and members of the putative Classes have been assessed
8 overdraft fees for transactions that occurred when they actually had sufficient funds in their
9 accounts to cover those transactions.

10     50. To compound the deception, Plaintiff Hawthorne's bank statements show
11 transactions ordered from low to high, even though Umpqua *actually* orders transactions high-to-
12 low.

13     51. For example, Plaintiff Hawthorne's transactions made between June 26, 2010,
14 and June 29, 2010, were improperly grouped together over several days and reordered from high to
15 low, causing an additional overdraft fee. Umpqua's improper grouping and high-to-low reordering
16 of those transactions doubled the total amount of overdraft fees charged. On June 29, 2010,
17 Plaintiff Hawthorne ended the day with an account balance of $104.26, according to her account
18 statement. On June 30, 2010, Umpqua posted two debit card transactions to the account. Even
19 though the transactions were listed in the order of lowest to highest, Umpqua in reality posted the
20 transactions of $254.17 and $12 in the order of highest to lowest. And Umpqua did this even
21 though the $12 transaction was initiated by Plaintiff earlier in time—in fact, an entire day earlier.

22     52. Thereafter, on July 1, 2010, Plaintiff Hawthorne was charged *two* overdraft fees
23 of $35 each, for a total of $70. These charges were incurred because Umpqua manipulated the
24 purchases and debits in the in order to increase the number of overdraft fees. Umpqua took the
25 transactions out of the order they were initiated and grouped the transaction before re-ordering them
26 high-to-low. Such machinations were not explained on Plaintiff Hawthorne's bank statement. In
27 fact, Umpqua deceptively hid such reordering on Plaintiff Hawthorne's bank statement by showing

28

COMPLAINT        -13-

1    a posting order *opposite* of the one actually used. Nor were such machinations ever disclosed in the
2    Account Agreement.

3           53.     As another example, Plaintiff Hawthorne's transactions made between July 2,
4    2010, and July 6, 2010, were improperly grouped together and reordered from high to low, causing
5    additional and excessive overdraft fees. Upon information and belief, Umpqua's improper high-to-
6    low reordering of those transactions significantly increased the total amount of overdraft fees. On
7    July 2, 2010, Plaintiff Hawthorne ended the day with an account balance of $520.84, according to
8    her account statement. On July 6, 2010, Umpqua posted six debit card transactions to the account.
9    Even though the transactions were listed in the order of lowest to highest, Umpqua in reality posted
10   the transactions of $400, $120, $66.85, $20.37, $11.95 and $9.08 in the order of highest to lowest.

11          54.     Thereafter, on July 7, 2010, Plaintiff Hawthorne was charged four overdraft fees
12   of $35 each, for a total of $140. These charges were incurred because Umpqua manipulated the
13   purchases and debits in the in order to increase the number of overdraft fees. Umpqua took the
14   transactions out of the order they were initiated and grouped the transaction before re-ordering them
15   high-to-low. Such machinations were not explained on Plaintiff Hawthorne's bank statement. In
16   fact, Umpqua deceptively hid such reordering on Plaintiff Hawthorne's bank statement by showing
17   a posting order opposite of the one actually used.

18          55.     Upon information and belief, in both examples, had the Bank posted transactions
19   in either a low-to-high order, or the order in which the transactions actually occurred, Plaintiff
20   Hawthorne would have been charged fewer overdraft fees.

21          56.     Umpqua refrains from immediately posting charges to a customer's account as it
22   receives them – sometimes for multiple business days. By holding charges rather than posting them
23   immediately to an account, Umpqua is able to amass a number of charges on the account.
24   Subsequently, Umpqua posts all of the amassed charges on a single date. When the group of
25   charges is eventually posted to the customer's account, Umpqua posts them in order of largest to
26   smallest – not in the order in which they were received or in the order in which they were charged.
27   This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be
28

COMPLAINT                              -14-

1  imposed. The delayed posting also prevents customers from ascertaining the accurate balances in
2  their accounts.

3    57.    Umpqua's policy and practice of posting charges from largest to smallest, rather
4  than chronologically, or from smallest to largest, is specifically designed to maximize the generation
5  of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in
6  such fees.

7    58.    Umpqua enforces an unconscionable policy whereby charges assessed are posted
8  to customers' accounts in a non-chronological order, from highest to lowest, and are held for
9  multiple days and then batched together, to maximize the number of overdraft transactions and fees.
10 Umpqua's processing practices substantially increase the likelihood that customers' smaller charges
11 will result in multiple overdraft fees. The practices provide Umpqua with substantially higher
12 service fee revenues than it would otherwise achieve absent these practices.

13   59.    As a result, Plaintiff and members of the Classes have been assessed overdraft
14 fees for transactions which occurred when they actually had sufficient funds in their accounts to
15 cover those transactions.

16   60.    Charging overdraft fees on transactions that did not actually "over-draft" an
17 account at the time they were initiated is materially deceptive, unconscionable, and in violation of
18 the Account Agreement.

19   **D.    Umpqua's Cloaking of Accurate Balance Information**

20   61.    Umpqua actively promotes the convenience of its debit cards and other electronic
21 debiting, but fails to provide customers with accurate balance information. When customers
22 execute account transactions, they generally do not have access to an accurate balance register or
23 balance information.

24   62.    Umpqua's computers are set up not to process transactions in the order
25 received—in "real time"—but in order from highest to lowest dollar amount so as to ensure that the
26 maximum number of overdraft charges are imposed on customers' accounts.

27   63.    Umpqua provides inaccurate balance information to its customers through its
28 electronic network. In certain cases, Umpqua informs its customers that they have a positive

COMPLAINT                                    -15-

1  balance when, in reality, they have a negative balance, despite the Bank's actual knowledge of
2  outstanding debits and transactions.

3      64.     Even when Umpqua has actual knowledge of outstanding transactions which
4  have already created a negative balance in a customer's account, it encourages the customer to incur
5  more overdraft charges by approving—rather than prudently declining—subsequent debit card
6  purchases and other electronic transactions.

7      65.     Umpqua also assesses overdraft fees at times when actual funds in the customer's
8  account are sufficient to cover all debits that have been submitted to the Bank for payment. It does
9  this by placing a "hold" on actual funds in the customer's account. In doing so, Umpqua charges
10 overdraft fees where it faces no risk, because the cash balance in the customer's account has not
11 dropped below zero.

12     66.     A debit card can be used to make a purchase in two ways: (1) an Automated
13 Clearing House ("ACH") transaction in which a customer enters his/her PIN number at the point of
14 sale; or (2) an "offline signature" transaction, in which the debit card is treated like a credit card and
15 the customer usually is required to sign a receipt. In the former, the money is debited from the
16 account instantaneously. In the latter, the "offline signature" transaction occurs in two parts: first,
17 authorization for the purchase amount is obtained by the merchant. Second, the transaction is not
18 actually "settled" (that is, money between the bank and the merchant does not change hands) until
19 the merchant submits the transaction to the bank sometime after the customer's purchase. Before
20 settlement, "authorization holds" are placed on the customer's account, preventing access to money
21 so held. For some transactions, the authorization hold is for an amount larger than the purchase
22 actually made by the customer. Umpqua charges an overdraft fee when the authorization hold
23 amount—not the purchase price—pushes an account balance into negative territory.

24     67.     Such "authorization hold" policies, and the extent to which they are used by
25 Umpqua to charge overdraft fees, are inconsistent with Umpqua's Account Agreement.

26     68.     The terms of the Account Agreement fail to alert customers that they must often
27 keep a large cushion of funds in their account in order to guard against an overdraft fee even when
28 customers do not spend more than the funds in their account, and are materially deceptive.

COMPLAINT                                    -16-

1   Accordingly, Umpqua charges customers overdraft fees even when there are sufficient funds in
2   customers' accounts to cover transactions.

3       69.       Charging an overdraft fee when in fact an account has never been over-drafted is
4   materially deceptive. By charging overdraft fees when in fact the customer's account has not been
5   over-drafted, Umpqua breached its contract with Plaintiff and members of the Class.

6       E.       **Umpqua's Failure to Notify Customers That Their Transactions Would**
7                **Cause Overdrafts Or Advise Them That They Could Avoid The Fee By Not**
8                **Making A Particular Transaction**

9       70.       At the time its debit cards are used in POS transactions or at ATMs, Umpqua is
10   able to determine, almost instantaneously, whether there are sufficient funds in a customer's account
11   to cover that particular transaction.   The Bank has the technological capability to decline
12   transactions (which it does when a pending transaction would exceed a pre-determined, overdraft
13   tolerance limit for the account), or notify customers at that very moment that the particular debit
14   card transaction would result in an overdraft. Prior to the implementation of the new requirements
15   of Regulation E (which required customers to "opt-in" before banks could charge overdraft fees on
16   debit cards transactions), Umpqua could have given customers the option to decline the transaction
17   to avoid incurring the overdraft fee, but it did not do so because it sought to maximize the amount of
18   revenue generated through its assessment of overdraft fees.

19      71.       Notwithstanding its technological capabilities and actual knowledge, Umpqua
20   failed to provide notice to Plaintiff and the Classes that a particular debit card transaction would
21   result in an overdraft and, hence, an overdraft fee. Because Umpqua's customers were not notified
22   of the potential overdraft, and were not given the option of declining the debit card transaction or
23   providing another form of payment, the customers were assessed monetary damages in the form of
24   overdraft fees.

25      F.       **Umpqua's Unconscionable Provisions and Policies**

26      72.       Umpqua's overdraft policies and practices are or were unconscionable in the
27   following respects, among others:

28

COMPLAINT                          -17-

1          a.          Prior to the new opt-in requirements of Regulation E, the Bank did not

2   obtain affirmative consent from checking account customers prior to processing a transaction that

3   would overdraw the account and result in an overdraft fee;

4          b.          The Bank does not alert its customers that a debit card transaction will

5   trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction,

6   before assessing an overdraft fee;

7          c.          The Account Agreement and related documents are contracts of

8   adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of

9   vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to

10  them or reject the agreement in its entirety;

11         d.          The amount of overdraft fees is disclosed in an ineffective,

12  ambiguous, misleading, and unfair manner, since it is not contained in the Account Agreement, but

13  rather in a different and separate document, which is not signed by the depositor;

14         e.          The Account Agreement provided to customers is ineffective,

15  ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank

16  groups together debit card transactions that occurred on subsequent days with debit card

17  transactions that occurred on earlier days, and reorders them so that higher debits that occurred on

18  subsequent days are posted to its customers' accounts before lower debits that occurred on earlier

19  days. In addition, the Account Agreement fails to give the period of time in which the Bank process

20  and reorders batches of transactions;

21         f.          The Account Agreement provided to customers is ineffective,

22  ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that Umpqua's

23  actual practice and policy is to uniformly and automatically create overdrafts for the purpose of

24  maximizing overdraft fee revenue, without regard or evaluation of the relative "importance" of

25  transactions;

26         g.          The account statements provided to customers are deceptive and

27  misleading in that they do not provide a reasonable method for customers to follow the daily

28  activity in their accounts as used by Umpqua for applying fees. As a result, accountholders cannot

COMPLAINT                          -18-

1 || easily determine why an overdraft fee was charged or what transaction the charge relates to – or

2 || even that Umpqua uses the high to low reordering practice at all. The Bank thus prevents its

3 || customers from determining the cause of overdraft fees and deceptively and misleadingly hides its

4 || unfair overdraft policies and procedures; and

5 ||                h.        Prior to the new opt-in requirements of Regulation E, the Bank did not

6 || reasonably disclose to customers that they had the option to "opt out" of the Bank's overdraft

7 || scheme.

8 ||        **G.        Umpqua's Overdraft Practices Harmed Plaintiff**

9 ||        73.        Umpqua's wrongful overdraft policies and practices described above harmed

10 || Plaintiff and members of the Classes. The following allegations regarding the named Plaintiff are

11 || made for purposes of illustrating the harm and damage sustained by Plaintiff and members of the

12 || Classes as a result of Umpqua's wrongful overdraft policies and practices.

13 ||        74.        Plaintiff is a current checking account customer of Umpqua.

14 ||        75.        In connection with her account, the Bank issued a debit card to Ms. Hawthorne.

15 || A debit card allows customers to access their checking account funds by using the card to execute a

16 || transaction. The charge is processed electronically, and the Bank has the option to accept or decline

17 || the transaction at the point of sale.

18 ||        76.        Umpqua wrongfully charged Ms. Hawthorne multiple overdraft fees on

19 || numerous occasions, as the examples provided in Section C, *supra*, indicate.

20 ||        77.        Umpqua failed to notify Plaintiff that she could be assessed overdraft fees on

21 || transactions even though there were sufficient funds in the checking account to cover the transaction

22 || at the time the transaction was executed. In addition, Umpqua never notified Plaintiff at the time

23 || she executed the purported insufficient funds transactions described above, that her checking

24 || account was overdrawn or that she would be charged an overdraft fee as a result of the transactions.

25 || Furthermore, Umpqua paid, rather than returned, all of the debit charges described above, even

26 || though Plaintiff's account purportedly lacked sufficient funds to cover the transactions.

27 ||        78.        Based on information and belief, the overdraft charges assessed Plaintiff are

28 || representative of millions of dollars of overdraft fees that Umpqua wrongfully assessed and

COMPLAINT                                -19-

1    deducted from its customers' accounts.    These wrongful takings are especially egregious
2    considering the fact that the Bank knew at the time of approval whether there were sufficient funds
3    in the account to cover the transaction.

4    **H.    The Damages Sustained by Plaintiff and the Classes**

5    79.    As shown by these examples, Umpqua's overdraft policies make it difficult for a
6    customer to avoid injury even if the customer keeps close track of the balance in his or her account.

7    80.    As a consequence of Umpqua's overdraft policies and practices, Plaintiff and the
8    Classes have been wrongfully forced to pay overdraft fees. Umpqua has improperly deprived
9    Plaintiff and the Classes of significant funds, causing ascertainable monetary losses and damages.

10    81.    As a consequence of Umpqua's improper overdraft fees, Umpqua has wrongfully
11    deprived Plaintiff and the Classes of funds to which it had no legitimate claim.

12    82.    Plaintiff and the Classes had sufficient funds to cover at least some of the
13    transactions for which she and the Classes were charged overdraft fees. Plaintiff and members of
14    the Classes either had adequate funds to cover the transactions posted to their accounts, or the
15    accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that
16    Umpqua could impose these wrongful charges. In many instances, Umpqua's manipulation of the
17    process for imposing overdraft fees triggered a cascade of charges that exponentially added to the
18    charges it collected from Plaintiff and Class members.

19    83.    All conditions precedent to the relief sought herein have either occurred or have
20    been performed or waived.

21

22    **FIRST CLAIM FOR RELIEF**
      **Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing**
23    **(On Behalf of the National Class)**

24    84.    Plaintiff repeats paragraphs 1 through 83 above.

25    85.    Plaintiff and Umpqua have contracted for bank account deposit, checking, ATM,
26    and debit card services, as embodied in Umpqua's Account Agreement and related documentation.

27    86.    Under the laws of the states where Umpqua does business, good faith is an
28    element of every contract pertaining to the assessment of overdraft fees. Whether by common law

COMPLAINT                              -20-

1  or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good
2  faith and fair dealing, in connection with executing contracts and discharging performance and other
3  duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.
4  Put differently, the parties to a contract are mutually obligated to comply with the substance of their
5  contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify
6  terms constitute examples of bad faith in the performance of contracts.

7      87.      Subterfuge and evasion violate the obligation of good faith in performance even
8  when an actor believes his conduct to be justified. Bad faith may be overt or may consist of
9  inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the
10  spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms,
11  and interference with or failure to cooperate in the other party's performance.

12      88.      Umpqua has breached the covenant of good faith and fair dealing in the Account
13  Agreement through its overdraft policies and practices as alleged herein.

14      89.      Plaintiff and the National Class have performed all, or substantially all, of the
15  obligations imposed on them under the Account Agreement.

16      90.      Plaintiff and members of the National Class have sustained damages as a result of
17  Umpqua's breach of the covenant of good faith and fair dealing.

18

19                  **SECOND CLAIM FOR RELIEF**
                        **Unconscionability**
20                  **(On Behalf of the National Class)**

21      91.      Plaintiff repeats paragraphs 1 through 83 above.

22      92.      Umpqua's overdraft policies and practices are or were substantively and
23  procedurally unconscionable in the following respects, among others:

24              a.      The Bank did not obtain affirmative consent from checking account
25  customers prior to processing a transaction that would overdraw the account and result in an
26  overdraft fee;

27

28

COMPLAINT                        -21-

1                 b.        The Bank does not alert its customers that a debit card transaction will

2 trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction,

3 before assessing an overdraft fee;

4                 c.        The Account Agreement and related documents are contracts of

5 adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of

6 vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to

7 them or reject the agreement in its entirety;

8                 d.        The amount of overdraft fees is disclosed in an ineffective,

9 ambiguous, misleading, and unfair manner, since it is not contained in the Account Agreement, but

10 rather in a different and separate document, which is not signed by the depositor;

11                 e.        The Account Agreement provided to customers is ineffective,

12 ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank

13 groups together debit card transactions that occurred on subsequent days with debit card

14 transactions that occurred on earlier days, and reorders them so that higher debits that occurred on

15 subsequent days are posted to its customers' accounts before lower debits that occurred on earlier

16 days. In addition, the Account Agreement fails to give the period of time in which the Bank process

17 and reorders batches of transactions;

18                 f.        The Account Agreement provided to customers is ineffective,

19 ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that Umpqua's

20 actual practice and policy is to uniformly and automatically create overdrafts for the purpose of

21 maximizing overdraft fee revenue, without regard or evaluation of the relative "importance" of

22 transactions; and

23                 g.        The account statements provided to customers are deceptive and

24 misleading in that they do not provide a reasonable method for customers to follow the daily

25 activity in their accounts as used by Umpqua for applying fees. As a result, accountholders cannot

26 readily determine why an overdraft fee was charged or what transaction the charge relates to – or

27 even that Umpqua uses the high to low reordering practice at all. The Bank thus prevents its

28

COMPLAINT                 -22-

1   customers from determining the cause of overdraft fees and deceptively and misleadingly hides its
2   unfair overdraft policies and procedures.

3       93.    Considering the great business acumen and experience of Umpqua in relation to
4   Plaintiff and the National Class, the great disparity in the parties' relative bargaining power, the
5   inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of
6   the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the
7   terms, the allocation of the risks between the parties, and similar public policy concerns, these
8   provisions are unconscionable and, therefore, unenforceable as a matter of law.

9       94.    Plaintiff and members of the National Class have sustained damages as a result of
10  Umpqua's unconscionable policies and practices alleged herein.

11

12                            **THIRD CLAIM FOR RELIEF**
                                  **Conversion**
13                  **(On Behalf of the National Class)**

14      95.    Plaintiff repeats paragraphs 1 through 83 above.

15      96.    Umpqua had and continues to have a duty to maintain and preserve its customers'
16  checking accounts and to prevent their diminishment through its own wrongful acts.

17      97.    Umpqua has wrongfully collected overdraft fees from Plaintiff and the members
18  of the National Class, and has taken specific and readily identifiable funds from their accounts in
19  payment of these fees in order to satisfy them.

20      98.    Umpqua has, without proper authorization, assumed and exercised the right of
21  ownership over these funds, in hostility to the rights of Plaintiff and the members of the National
22  Class, without legal justification.

23      99.    Umpqua continues to retain these funds unlawfully without the consent of
24  Plaintiff or members of the National Class.

25      100.    Umpqua intends to permanently deprive Plaintiff and the members of the
26  National Class of these funds.

27

28

COMPLAINT                    -23-

101.    These funds are properly owned by Plaintiff and the members of the National Class, not Umpqua, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the National Class.

102.    Plaintiff and the members of the National Class are entitled to the immediate possession of these funds.

103.    Umpqua has wrongfully converted these specific and readily identifiable funds.

104.    Umpqua's wrongful conduct is continuing.

105.    As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the National Class have suffered and continue to suffer damages.

106.    By reason of the foregoing, Plaintiff and the members of the National Class are entitled to recover from Umpqua all damages and costs permitted by law, including all amounts that Umpqua has wrongfully converted.

### FOURTH CLAIM FOR RELIEF
#### Unjust Enrichment
#### (On Behalf of the National Class)

107.    Plaintiff repeats paragraphs 1 through 83 above.

108.    Plaintiff, on behalf of herself and the National Class, asserts a common law claim for unjust enrichment.

109.    By means of Umpqua's wrongful conduct alleged herein, Umpqua knowingly provides banking services to Plaintiff and members of the National Class that are and/or were unfair, unconscionable, and oppressive.

110.    Umpqua knowingly received and retained wrongful benefits and funds from Plaintiff and members of the National Class. In so doing, Umpqua acted with conscious disregard for the rights of Plaintiff and members of the National Class.

111.    As a result of Umpqua's wrongful conduct as alleged herein, Umpqua has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the National Class.

COMPLAINT                                    -24-

1       112.    Umpqua's unjust enrichment is traceable to, and resulted directly and
2  proximately from, the conduct alleged herein.

3       113.    Under the common law doctrine of unjust enrichment, it is inequitable for
4  Umpqua to be permitted to retain the benefits it received, and is still receiving, without justification,
5  from the imposition of overdraft fees on Plaintiff and members of the National Class in an unfair,
6  unconscionable, and oppressive manner. Umpqua's retention of such funds under circumstances
7  making it inequitable to do so constitutes unjust enrichment.

8       114.    The financial benefits derived by Umpqua rightfully belong to Plaintiff and
9  members of the National Class. Umpqua should be compelled to disgorge in a common fund for the
10 benefit of Plaintiff and members of the National Class all wrongful or inequitable proceeds received
11 by the Bank. A constructive trust should be imposed upon all wrongful or inequitable sums
12 received by Umpqua traceable to Plaintiff and the members of the National Class.

13      115.    Plaintiff and members of the National Class have no adequate remedy at law.

14

15                              **FIFTH CLAIM FOR RELIEF**
   **Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200**
16                    **(On Behalf of the California State Subclass)**

17      116.    Plaintiff repeats paragraphs 1 through 83 above.

18      117.    Umpqua's conduct described herein violates the Unfair Competition Law (the
19 "UCL"), codified at California Business and Professions Code section 17200, *et seq.*, in the
20 following respects, among others:

21              a.      Umpqua's practices relating to the imposition of overdraft fees are
22 unconscionable, in violation of California Civil Code section 1770(a)(19), and, as a result, constitute
23 an unlawful business act or practice within the meaning of the UCL;

24              b.      Umpqua's practices relating to the imposition of overdraft fees violate
25 California Civil Code sections 1770(a)(5), (14) and (1), and, as a result, constitute unlawful business
26 acts or practices within the meaning of the UCL;

27              c.      Umpqua's practices relating to the imposition of overdraft fees
28 constitute unfair business acts or practices within the meaning of the UCL; and

COMPLAINT                                -25-

d.  Umpqua's practice of falsely indicating on customers' account statements that the customers' transactions are ordered from low-to-high (when they are in fact ordered from high-to-low) constitute fraudulent practices within the meaning of the UCL.

118.  The harm to Plaintiff and the California State Subclass arising from Umpqua's unlawful and unfair practices relating to the imposition of overdraft fees outweighs the utility, if any, of those practices.

119.  Umpqua's unlawful and unfair business practices relating to the imposition of overdraft fees arc immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff and members of the California State Subclass.

120.  As a result of Umpqua's violations of the UCL, Plaintiff and members of the California Statute Subclass have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby have suffered and will continue to suffer actual damages.

121.  Pursuant to California Business and Professions code section 17203, Plaintiff and the California State Subclass are therefore entitled to, *inter alia*:

a.  An order requiring Umpqua to cease the unlawful and unfair acts alleged herein;

b.  Full restitution of all overdraft fees paid to Umpqua on check card transactions, including debit card and ATM transactions, pursuant to California Code of Civil Procedure section 384;

c.  Pre-judgment interest at the highest rate allowable by law; and

d.  Payment of their attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.  Declaring Umpqua's overdraft fee policies and practices to be wrongful, unfair, and unconscionable;

COMPLAINT                    -26-

1      2.      Permanently enjoining Umpqua from continuing its unfair, fraudulent, wrongful,

2    and deceptive acts alleged herein;

3      3.      Restitution of all overdraft fees paid to Umpqua by Plaintiff and the Classes, as a

4    result of the wrongs alleged herein in an amount to be determined at trial;

5      4.      Disgorgement of the ill-gotten gains derived by Umpqua from its misconduct;

6      5.      Establishment of a constructive trust over all of the proceeds in Umpqua's

7    possession belonging to the Plaintiff and members of the Classes;

8      6.      Actual damages in an amount according to proof in an amount of at least Five

9    Million Dollars ($5,000,000.00);

10     7.      Punitive and exemplary damages;

11     8.      Pre-judgment and post-judgment interest at the maximum rate permitted by

12   applicable law;

13     9.      Costs and disbursements assessed by Plaintiff in connection with this action,

14   including reasonable attorneys' fees pursuant to applicable law; and

15     10.     Such other relief as this Court deems just and proper.

16

17

18                                              Respectfully submitted,

19

20

21                                              HASSAN A. ZAVAREEI

22                                              hzavareei@tzlegal.com
                                                California Bar No.: 181547
23                                              California Bar No.: 238293
                                                **TYCKO & ZAVAREEI**
24                                              2000 L Street, N.W.
25                                              Suite 808
                                                Washington, D.C. 20036
26                                              Telephone: (202) 973-0900
                                                Facsimile: (202) 973-0950
27

28                                              *Counsel for Plaintiff and the Proposed Classes*

     COMPLAINT                        -27-

# EXHIBIT A

## FUNDS AVAILABILITY POLICY DISCLOSURE

*Your Ability To Withdraw Funds At Umpqua Bank.* Our policy is to make funds from your cash and check deposits available to you on the first business day after the day we receive your deposit. However, funds from electronic direct deposits will be available on the day we receive the deposit. Once the funds are available, you can withdraw them in cash and/or we will use them to pay checks that you have written. For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays, and federal holidays. We have different deposit cut-off hours for different locations. If you make a deposit before our cut-off hour on a business day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit after our cut-off hour on a day we are not open, we will consider that the deposit was made on the next business day we are open.

*Reservation of Right to Hold.* In some cases, we will not make all of the funds that you deposit by check available to you on the first business day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the fifth business day after the day of your deposit. The first $100 of your deposit, however, will be available on the first business day after the day of your deposit. If we are not going to make all of the funds from your deposit available on the first business day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we will mail you the notice by the next business day after we receive your deposit. If you need the funds from a deposit right away, you should ask us when the funds will be available.

*Longer Delays May Apply.* We may delay your ability to withdraw funds deposited by check into your account an additional number of days for these reasons:

1. You deposit checks totaling more than $5,000 on any one day.
2. You redeposit a check that has been returned unpaid.
3. You have overdrawn your account repeatedly in the last six months.
4. We believe a check you deposit will not be paid.
5. There is an emergency, such as failure of computer or communications equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the eleventh business day after the day of your deposit.

*Holds On Other Funds.* If we cash a check for you that is drawn on another financial institution, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it. If we accept for deposit a check that is drawn on another financial institution, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere in this disclosure for the type of check that you deposited.

*Special Rules For New Accounts.* If you are a new customer, the following special rules will apply during the first 30 days your account is open:

Funds from electronic direct deposits to your account will be available on the day we receive the deposit. Funds from deposits of cash, wire transfers, and the first $5,000 of a day's total deposits of cashier's, certified, tellers, traveler's, and federal, state and local government checks will be available on the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you. The excess over $5,000 will be available on the ninth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,000 will not be available until the second business day after the day of your deposit.

Funds from deposits of checks drawn on Umpqua Bank will be available on the first business day after the day of your deposit. Funds from all other check deposits will be available not later than the eleventh business day after the day of your deposit.

## OVERDRAFT DISCLOSURE

*An insufficient funds balance could result in several ways, such as:* (1) the payment of checks, electronic funds transfers, or other withdrawal requests; (2) payments authorized by you; (3) the return of unpaid items deposited by you; (4) the imposition of bank service charges; (5) the deposit of items which according to our Funds Availability Policy, are treated as not yet available or finally paid.

*If there are funds to cover some but not all of the checks,* withdrawals or other debits (such as charges) posting to your account, we may post these items, for which there are funds, in any order we may choose at our sole discretion.

*We are not obligated to pay any item presented for payment* if your account does not contain sufficient funds. However, if you maintain your account in good standing (defined as making regular deposits and bringing your account to a positive balance at least once every 30 days) and there are no legal orders outstanding, we may approve your reasonable overdrafts as a non-contractual courtesy. We may, however, refuse to pay an overdraft for you at any time even though we may have previously paid overdrafts for you. You will be notified by mail of any non-sufficient fund (NSF) item(s ) paid or returned that you may have; however, we have no obligation to notify you before we pay or return an item. The amount of any overdraft, plus the NSF handling fee, shall be due and payable upon demand. If there is an overdraft paid by us on an account with more than (1) owner, each owner or agent shall be jointly and severally liable for each overdraft plus the NSF handling fee. A fee will be charged for items paid or returned on the account. A fee will be charged if the account continues in an overdrawn status. Please refer to the Umpqua Other Services and Fee Schedule for current pricing.

If you do not want us to pay items presented against insufficient funds please visit your local Store, or call us or write us with your request.

*Your account must be brought to a positive balance* at least once every 30 days in order to continue your account privileges. If you are not able to do so, you will receive a letter from us informing you of the situation and your options. If, after a period of time your account has not been brought to a positive balance, we will have no option but to close your account and take other steps to recover the overdrawn funds. These steps may include submitting a negative credit report and turning the account over to a collection agency.

*We do not encourage you to regularly overdraw your account,* and we offer overdraft protection products that will help you maintain you account and reduce the cost of overdrafts. Please ask your Store Associate for more information on our overdraft protection services.

(page 1 of 1)

# EXHIBIT B

## TERMS AND CONDITIONS
## OF YOUR ACCOUNT

**IMPORTANT ACCOUNT OPENING INFORMATION** - Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

**AGREEMENT** - This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us. Please read this carefully. If you sign the signature card or open or continue to use the account, you agree to these rules. You will receive a separate schedule of rates, qualifying balances, and fees if they are not included in this document. If you have any questions, please call us.

This agreement is subject to applicable federal laws and applicable laws in the states of California, Oregon and Washington (except to the extent that this agreement can and does vary such rules or laws). The body of state and federal law that governs our relationship with you, however, is too large and complex to be reproduced here. The purpose of this document is to:

(1) summarize some laws that apply to common transactions;
(2) establish rules to cover transactions or events which the law does not regulate;
(3) establish rules for certain transactions or events which the law regulates but that permits variation by agreement; and
(4) give you disclosures of some of our policies to which you may be entitled or in which you may be interested.

If any provision of this document is found to be unenforceable according to its terms, all remaining provisions will continue in full force and effect. We may permit some variations from our standard agreement, but we must agree to any variation in writing either on the signature card for your account or in some other document.

As used in this document the words "we," "our," and "us" mean the financial institution and the words "you" and "your" mean the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account. The headings in this document are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

**LIABILITY** - You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges. You authorize us to deduct these charges directly from the account balance as accrued. You will pay any additional reasonable charges for services you request which are not covered by this agreement

Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account. This liability is due immediately, and can be deducted directly from the account balance whenever sufficient funds are available. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft. You will also be liable for our costs to collect the deficit as well as for our reasonable attorneys' fees, to the extent permitted by law, whether incurred as a result of collection or in any other dispute involving your account including, but not limited to, disputes between you and another joint owner; you and an authorized signer or similar party; or a third party claiming an interest in your account.

**DEPOSITS** - We will give only provisional credit until collection is final for any items, other than cash, we accept for deposit (including items drawn "on us"). Actual credit for deposits of, or payable in, foreign currency will be at the exchange rate in effect on final collection in U.S. dollars. We are not responsible for transactions by mail or outside depository until we actually record them. We will treat and record all transactions received after our "daily cutoff time" on a business day we are open, or received on a day we are not open for business, as if initiated on the next business day that we are open.

We may require not less than 7 days' notice in writing before each withdrawal from an interest-bearing account other than a time deposit, or from any other savings account as defined by Regulation D. Withdrawals from a time account prior to maturity or prior to any notice period may be restricted and may be subject to penalty. See your notice of penalty for early withdrawal.

**WITHDRAWALS** -

Generally - Unless clearly indicated otherwise on the account records, any of you, acting alone, who signs to open the account or has authority to make withdrawals may withdraw or transfer all or any part of the account balance at any time. Each of you (until we receive written notice to the contrary) authorizes each other person who signs or has authority

to make withdrawals to indorse any item payable to you or your order for deposit to this account or any other transaction with us.

Postdated checks - A postdated check is one which bears a date later than the date on which the check is written. We may properly pay and charge your account for a postdated check even though payment was made before the date of the check, unless we have received written notice of the postdating in time to have a reasonable opportunity to act.

Checks and withdrawal rules - If you do not purchase your check blanks from us, you must be certain that we approve the check blanks you purchase. We may refuse any withdrawal or transfer request which you attempt on forms not approved by us or by any method we do not specifically permit. We may refuse any withdrawal or transfer request which is greater in number than the frequency permitted, or which is for an amount greater or less than any withdrawal limitations. We will use the date the transaction is completed by us (as opposed to the date you initiate it) to apply the frequency limitations. If we are presented with an item drawn against your account that would be a "substitute check," as defined by law, but for an error or defect in the item introduced in the substitute check creation process, you agree that we may pay such item. See the funds availability policy disclosure for information about when you can withdraw funds you deposit. For those accounts to which our funds availability policy disclosure does not apply, you can ask us when you make a deposit when those funds will be available for withdrawal. In addition, we may place limitations on the account until your identity is verified.

Overdrafts - You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. You agree that we may charge fees for overdrafts and use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

Waivers - Even if we honor a nonconforming request, we are not required to do so later. We may treat continued abuse of the stated limitations (if any) as your act of closing the account, or we may at our option reclassify your account as a transaction account. If we reclassify your account, your account will be subject to the fees and earnings rules of the new account classification.

Multiple signatures, electronic check conversion, and similar transactions - An electronic check conversion transaction is a transaction where a check or similar item is converted into an electronic fund transfer as defined in the Electronic Fund Transfers regulation. In these types of transactions the check or similar item is either removed from circulation (truncated) or given back to you. As a result, we have no opportunity to review the check to examine the signatures on the item. You agree that, as to these or any items as to which we have no opportunity to examine the signatures, you waive any requirement of multiple signatures. Our policy does not permit any account to have dual or other multiple signature requirements.

**OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION** - These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds. As used in this agreement "party" means a person who, by the terms of the account, has a present right, subject to request, to payment from a multiple-party account other than as an agent.

Individual Account - is an account or certificate in the name of one person.

Joint Account - is an account or certificate owned by the named parties. Upon the death of any of them, ownership passes to the survivor(s).

Joint Account of Husband and Wife with Right of Survivorship - is an account or certificate owned by the named parties, who are husband and wife, and is presumed to be their community property. Upon the death of either of them, ownership passes to the survivor.

Community Property Account of Husband and Wife - is an account or certificate which is the community property of the named parties who are husband and wife. The ownership during lifetime and after the death of a spouse is determined by the law applicable to community property generally and may be affected by a will.

Joint Account - No Survivorship (As Tenants in Common) - is an account or certificate that is owned by the named parties as tenants in common. Upon the death of any party, the ownership interest of that party passes to the named pay-on-death payee(s) of that party or, if none, to the estate of that party.

P.O.D. Account with Single Party - is an account or certificate owned by the named party. Upon the death of that party, ownership passes to the named pay-on-death payee(s).

P.O.D. Account with Multiple Parties - is an account or certificate owned by the named parties. Upon the death of any of them, ownership passes to the survivor(s). Upon the death of all of them, ownership passes to the named pay-on-death payee(s).

Totten Trust Account - (subject to this form) - If two or more of you create an account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, such beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating either of these account types reserves the right to: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

Trust Account Subject to Separate Agreement - We will abide by the terms of any separate agreement which clearly pertains to the account and which you file with us. Any additional consistent terms stated on this form will also apply.

BUSINESS, ORGANIZATION AND ASSOCIATION ACCOUNTS - Earnings in the form of interest, dividends, or credits will be paid only on collected funds, unless otherwise provided by law or our policy. We may require the governing body of the entity opening the account to give us a separate authorization telling us who is authorized to act on its behalf. We will honor the authorization until we actually receive written notice of a change from the governing body of the entity.

SUB ACCOUNTS - A checking account will consist of a checking sub account and a savings sub account. The Bank may periodically transfer funds between these two sub accounts. On a sixth transfer during a calendar month, any funds in the savings sub account will be transferred back to the checking sub account. If your checking account is in a product which earns interest, your interest calculation will remain the same. Otherwise, the savings sub account will be non interest bearing. The savings sub account will be governed by the rules governing our other savings accounts indicated within the Transaction Limitations Section of your Account Agreement. This process will not affect your available balance, the interest you may earn, FDIC insurance protection, or your monthly statement.

STOP PAYMENTS - You must make any stop-payment order in the manner required by law and we must receive it in time to give us a reasonable opportunity to act on it before our stop-payment cutoff time. To be effective, your stop-payment order must precisely identify the number, date and amount of the item, and the payee.

You may stop payment on any item drawn on your account whether you sign the item or not, if you have an equal or greater right to withdraw from this account than the person who signed the item. A release of the stop-payment request may be made only by the person who initiated the stop-payment order.

We are not obligated to notify you when a stop-payment order expires.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop-payment order. Our stop-payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).

TELEPHONE TRANSFERS - A telephone transfer of funds from this account to another account with us, if otherwise arranged for or permitted, may be made by the same persons and under the same conditions generally applicable to withdrawals made in writing. Unless a different limitation is disclosed in writing, we restrict the number of transfers from a savings account to another account or to third parties, to a maximum of six per month (less the number of "preauthorized transfers" during the month). Other account transfer restrictions may be described elsewhere.

AMENDMENTS AND TERMINATION - We may change any term of this agreement. Rules governing changes in interest rates are provided separately in the Truth-in-Savings disclosure or in another document. For other changes, we will give you reasonable notice in writing or by any other method permitted by law. We may also close this account at any time upon reasonable notice to you and tender of the account balance personally or by mail. Items presented for payment after the account is closed may be dishonored. When you close your account, you are responsible for leaving enough money in the account to cover any outstanding items to be paid from the account. Reasonable notice depends on the circumstances, and in some cases such as when we cannot verify your identity or we suspect fraud, it might be reasonable

for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, we might immediately freeze or close your account and then give you notice. You agree to keep us informed of your current address at all times. Notice from us to any one of you is notice to all of you. If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s).

STATEMENTS - Your duty to report unauthorized signatures, alterations and forgeries - You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any unauthorized signatures or alterations, you must promptly notify us of the relevant facts. As between you and us, if you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we used ordinary care and, if not, whether we contributed to the loss and in Oregon and Washington if we substantially contributed to the loss). The loss could be not only with respect to items on the statement but other items with unauthorized signatures or alterations by the same wrongdoer.

You agree that the time you have to examine your statement and report to us will depend on the circumstances, but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

You further agree that if you fail to report any unauthorized signatures, alterations or forgeries in your account within 60 days of when we first send or make the statement available, you cannot assert a claim against us on any items in that statement, and as between you and us the loss will be entirely yours. This 60-day limitation is without regard to whether we used ordinary care. The limitation in this paragraph is in addition to that contained in the first paragraph of this section.

Your duty to report other errors - In addition to your duty to review your statements for unauthorized signatures, alterations and forgeries, you agree to examine your statement with reasonable promptness for any other error - such as an encoding error. You agree that the time you have to examine your statement and report to us will depend on the circumstances. However, such time period shall not exceed 60 days. Failure to examine your statement and report any such errors to us within 60 days of when we first send or make the statement available precludes you from asserting a claim against us for any such errors on items identified in that statement and as between you and us the loss will be entirely yours.

Errors relating to electronic fund transfers or substitute checks - For information on errors relating to electronic fund transfers (e.g., computer, debit card or ATM transactions) refer to your Electronic Fund Transfers disclosure and the sections on consumer liability and error resolution. For information on errors relating to a substitute check you received, refer to your disclosure entitled Substitute Checks and Your Rights.

ACCOUNT TRANSFER - This account may not be transferred or assigned without our prior written consent.

DIRECT DEPOSITS - If, in connection with a direct deposit plan, we deposit any amount in an account which should have been returned to the Federal Government for any reason, you authorize us to deduct the amount of our liability to the Federal Government from the account or from any other account you have with us, without prior notice and at any time, except as prohibited by law. We may also use any other legal remedy to recover the amount of our liability.

SETOFF - We may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt you owe us now or in the future, by any of you having the right of withdrawal, to the extent of such persons' or legal entity's right to withdraw. The amount of the setoff may be further limited by applicable law. If the debt arises from a note, "any due and payable debt" includes the total amount of which we are entitled to demand payment under the terms of the note at the time we set off, including any balance the due date for which we properly accelerate under the note.

This right of setoff does not apply to this account if prohibited by law. For example, the right of setoff does not apply to this account if: (a) it is an Individual Retirement Account or similar tax-deferred account, or (b) the debt is created by a consumer credit transaction under a credit card plan (but this does not affect our rights under any consensual security interest), or (c) the debtor's right of withdrawal only arises in a representative capacity. We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account. You agree to hold us harmless from any claim arising as a result of our exercise of our right of setoff.

©1988, 2009 Wolters Kluwer Financial Services - Bankers Systems™Form UPQ-TC-MULTI 9/18/2009

(page 2 of 3)

**AUTHORIZED SIGNER (Individual Accounts only)** - A single individual is the owner. The authorized signer is merely designated to conduct transactions on the owner's behalf. The owner does not give up any rights to act on the account, and the authorized signer may not in any manner affect the rights of the owner or beneficiaries, if any. The owner is responsible for any transactions of the authorized signer. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf.

The owner may terminate the authorization at any time, and the authorization is automatically terminated by the death of the owner. However, we may continue to honor the transactions of the authorized signer until: (a) we have received written notice or have actual knowledge of the termination of authority, and (b) we have a reasonable opportunity to act on that notice or knowledge. We may refuse to accept an authorized signer.

**RESTRICTIVE LEGENDS** - The automated processing of the large volume of checks we receive prevents us from inspecting or looking for special instructions or "restrictive legends" on every check. Examples of restrictive legends placed on checks are "must be presented within 90 days" or "not valid for more than $1,000.00." For this reason, we are not required to honor any restrictive legend placed on checks you write unless we have agreed in writing to the restriction. We are not responsible for any losses, claims, damages, or expenses that result from your placement of these or other special instructions on your checks.

**PAYMENT ORDER OF ITEMS** - The law permits us to pay items drawn on your account in any order (for purposes of this section "items" means checks, orders and electronic transactions). To assist you in handling your account with us, we are providing you with the following information regarding how we process those items.

When processing checks or orders drawn on your account, our policy is to pay them according to the dollar amount. We pay the largest dollar items first by transaction type. The order in which items are paid is important if there is not enough money in your account to pay all of the items that are presented. There is no policy that is favorable in every instance. If the smallest items are paid first, you may have fewer NSF or overdraft fees, but the largest, and perhaps more important items (such as rent or mortgage payments) might not be paid. However, if the largest items are paid first, your most important items might be paid but it may increase the overdraft or NSF fees if funds are not available to pay all of the items.

If an item is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item (NSF). The amounts of the overdraft and NSF fees are disclosed elsewhere. We encourage you to make careful records and practice good account management. This will help you to avoid writing checks or drafts without sufficient funds and incurring the resulting fees.

**CHECK PROCESSING** - We may process items mechanically by relying on the information encoded along the bottom of the items. This means that we may not individually examine all of your items to determine if the item is properly completed, signed and indorsed. You agree that we have not failed to exercise ordinary care solely because we use an automated system to process items and do not inspect all items presented in such a manner. We reserve the right not to inspect each item because using an automated process helps us keep costs down for you and all account holders. We may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are insufficient available funds.

**CHECK CASHING** - We may charge a fee for anyone that does not have an account with us who is cashing a check, draft or other instrument written on your account. We may also require reasonable identification to cash such a check, draft or other instrument. We can decide what identification is reasonable under the circumstances and such identification may be documentary or physical and may include collecting a thumbprint or fingerprint.

**ACH AND WIRE TRANSFERS** - This agreement is subject to Article 4A of the Uniform Commercial Code - Fund Transfers as adopted in the state in which you have your account with us. If you originate a fund transfer for which Fedwire is used, and you identify by name and number a beneficiary financial institution, an intermediary financial institution or a beneficiary, we and every receiving or beneficiary financial institution may rely on the identifying number to make payment. We may rely on the number even if it identifies a financial institution, person or account other than the one named. You agree to be bound by automated clearing house association rules. These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the Uniform Commercial Code. If we do not receive such payment, we are entitled to

a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited. If we receive a payment order to credit an account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit.

**FICTITIOUS BUSINESS NAME ACCOUNTS** - If the name in which the account is held is fictitious, each account holder represents that one or more of the account holders have the right to use that name and have fulfilled all legal requirements for using and or doing business under that name.

**FACSIMILE SIGNATURES** - Unless you make advance arrangements with us, we have no obligation to honor facsimile signatures on your checks or other orders. If we do agree to honor items containing facsimile signatures, you authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money, that are drawn on us. You give us this authority regardless of by whom or by what means the facsimile signature(s) may have been affixed so long as they resemble the facsimile signature specimen filed with us, and contain the required number of signatures for this purpose. You must notify us at once if you suspect that your facsimile signature is being or has been misused.

**STALE-DATED CHECKS** - We are not obligated to, but may at our option, pay a check, other than a certified check, presented for payment more than six months after its date. If you do not want us to pay a stale-dated check, you must place a stop-payment order on the check in the manner we have described elsewhere.

**UNCLAIMED PROPERTY** - The law establishes procedures under which unclaimed property must be surrendered to the state. (We may have our own rules regarding dormant accounts, and if we charge a fee for dormant accounts it will be disclosed to you elsewhere.) Generally, the funds in your account are considered unclaimed if you have not had any activity or communication with us regarding your account over a period of years. Ask us if you want further information about the period of time or type of activity that will prevent your account from being unclaimed. If your funds are surrendered to the state, you may be able to reclaim them, but your claim must be presented to the state. Once your funds are surrendered, we no longer have any liability or responsibility with respect to the funds.

**CASH TRANSACTION REPORTING** - To help law enforcement agencies detect illegal activities, the law requires all financial institutions to gather and report information on some types of cash transactions. If the information we need to complete the report is not provided, we are required to refuse to handle the transaction. If you have any questions regarding these rules, please contact your local Internal Revenue Service office.

**CREDIT VERIFICATION** - You agree that we may verify credit and employment history by any necessary means, including preparation of a credit report by a credit reporting agency.

**LEGAL ACTIONS AFFECTING YOUR ACCOUNT** - If we are served with a subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or similar order relating to your account (termed "legal action" in this section), we will comply with that legal action. Or, in our discretion, we may freeze the assets in the account and not allow any payments out of the account until a final court determination regarding the legal action. We may do these things even if the legal action involves less than all of you. In these cases, we will not have any liability to you if there are insufficient funds to pay your items because we have withdrawn funds from your account or in any way restricted access to your funds in accordance with the legal action. Any fees or expenses we incur in responding to any legal action (including, without limitation, attorneys' fees and our internal expenses) may be charged against your account. The list of fees applicable to your account(s) provided elsewhere may specify additional fees that we may charge for certain legal actions. We may also freeze your account if we receive conflicting instructions from owners or signers, pending resolution of the conflict by joint written instructions from the conflicting parties or by final court determination.

**UNLAWFUL INTERNET GAMBLING NOTICE** - Restricted transactions as defined in Federal Reserve Regulation GG are prohibited from being processed through this account or relationship. Restricted transactions generally include, but are not limited to, those in which credit, electronic fund transfers, checks, or drafts are knowingly accepted by gambling businesses in connection with the participation by others in unlawful Internet gambling.

**ADDRESS OR NAME CHANGES** - You are responsible for notifying us of any change in your address or your name. Unless we agree otherwise, change of address or name must be made in writing by at least one of the account holders. Informing us of your address or name change on a check reorder form is not sufficient. We will attempt to communicate with you only by use of the most recent address you have provided to us. If provided elsewhere, we may impose a service fee if we attempt to locate you.

©1988, 2009 Wolters Kluwer Financial Services - Bankers Systems™ Form UPD-TC-MULTI 9/18/2009