Hassan A. Zavareei (SBN 181547)
hzavareei@tzlegal.com
**TYCKO & ZAVAREEI, LLP**
2000 L Street, N.W., Suite 808
Washington, DC 20036
Tel.: (202) 973-0900
Fax: (202) 973-0950

Jeffrey M. Ostrow
ostrow@kolawyers.com
**KOPELOWITZ OSTROW, P.C.**
200 SW 1st Avenue, 12th Floor
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
Fax:  (954) 525-4300

Byron T. Ball (SBN 10195)
btb@balllawllp.com
**THE BALL LAW FIRM, L.L.P.**
10886 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90024
Tel: (310) 446-6148
Fax: (310) 441-5386

*Attorneys for Plaintiffs, Amber Hawthorne,
Christopher Kneer, and Victoria Kneer*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| AMBER HAWTHORNE, CHRISTOPHER KNEER, and VICTORIA KNEER on Behalf of Themselves and All Others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>UMPQUA BANK,<br><br>Defendant. | Civil Action No.: 3:11-cv-06700-JST<br><br>Honorable Jon S. Tigar<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT UMPQUA BANK'S MOTION FOR JUDGMENT ON THE PLEADINGS** |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

PROCEDURAL BACKGROUND ................................................................................. 3

LEGAL STANDARD .................................................................................................... 4

ARGUMENT ................................................................................................................. 4

   A.   The FDIA's parity provision does not preempt state law claims of general
       applicability. ................................................................................................... 4

   B.   Each of Plaintiffs' claims is premised on Umpqua's misrepresentations relating to
       the posting order of debit card transactions.................................................... 6

   C.   Gutierrez did not preempt claims based on misrepresentation, fraud,
       or concealment. ............................................................................................... 9

   D.   The Ninth Circuit's Gutierrez Decision Provides No Support for Judgment on the
       Pleadings. ...................................................................................................... 11

       1.   Plaintiffs' "unlawful" and "unfair" prong UCL claims are not preempted. ......... 12

             a.   "Unfair" prong. ...................................................................................... 12

             b.   "Unlawful" prong ................................................................................... 13

       2.   Plaintiffs' breach of the covenant of good faith and fair dealing claims
           are not preempted. ............................................................................... 16

       3.   Plaintiffs' unjust enrichment and conversion claims are not preempted.............. 17

   E.   Plaintiffs adequately allege an express breach of contract. ............................. 18

CONCLUSION ............................................................................................................ 19

# TABLE OF AUTHORITIES

## Cases

*Aguayo v. U.S. Bank*,
   653 F.3d 912 (9th Cir. 2011) .................................................................................. 12

*Am. Rivers v. F.E.R.C.*,
   201 F.3d 1186 (9th Cir. 1999) .................................................................................. 5

*Ball v. FleetBoston Fin. Corp.*,
   79 Cal. Rptr. 3d 402 (2008) .................................................................................. 15

*Baptista v. JP Morgan*,
   2010 WL 2342436 (M.D. Fla. 2010) .................................................................... 18

*Bardin v. Daimlerchrysler Corp.*,
   136 Cal. App. 4th 1255 (2006) .............................................................................. 12

*Berry v. American Express Publishing, Inc.*,
   147 Cal. App. 4th 224 (2007) .............................................................................. 15

*Boschma v. Home Loan Ctr., Inc.*,
   198 Cal. App. 4th 230 (2011) .............................................................................. 13

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) .................................................................................. 12, 13

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) .............................................................................................. 5

*Collins v. eMachines, Inc.*,
   202 Cal. App. 4th 249 (2011), *reh'g denied* (Dec. 15, 2011), *as modified* (Dec. 28, 2011),
   *review denied* (Feb. 15, 2012) .............................................................................. 13

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
   447 U.S. 102 (1980) .............................................................................................. 5

*Consumer Solutions REO, LLC v. Hillery*,
   658 F. Supp. 2d 1002 (N.D. Cal. 2009) ................................................................ 15

*Dworkin v. Hustler Magazine Inc.*,
   867 F.2d 1188 (9th Cir.1989) ................................................................................ 4

*Gutierrez v. Wells Fargo & Co.*,
   622 F. Supp. 2d 946 (N.D. Cal. 2009) .................................................................. 15

*Gutierrez v. Wells Fargo Bank, N.A.*, ("*Gutierrez I*")
   730 F. Supp. 2d 1080, 1124 (N.D. Cal. 2010) *aff'd in part, rev'd in part and remanded*
   *sub nom. Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712 (9th Cir. 2012).......... 1, 7, 8, 9, 10, 16

*Gutierrez v. Wells Fargo Bank, N.A.*, ("*Gutierrez II*")
   C 07-05923 WHA, 2013 WL 2048030 (N.D. Cal. May 14, 2013) ..................... 3, 7, 9, 11

*Gutierrez v. Wells Fargo Bank, NA*,
   704 F.3d 712 (9th Cir. 2012) ..................................................... 1, 2, 9, 10, 11, 12, 16

ii

*Guz v. Bechtel Nat'l, Inc.,*
   24 Cal. 4th 317 (2000) ............................................................................................................ 17

*Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.,*
   896 F.2d 1542 (9th Cir.1990) ................................................................................................... 4

*Hernandez v. Hilltop Financial Mortgage, Inc.,*
   622 F. Supp. 2d 842, 850-51 (N.D. Cal. 2007) ...................................................................... 14

*Hitz v. First Interstate Bank,*
   38 Cal. App. 4th 274 (1995) .................................................................................................... 14

*In re Checking Account Overdraft Litig.,*
   694 F. Supp. 2d 1302 (S.D. Fla. 2010) ................................................................................... 17

*Jefferson v. Chase Home Finance LLC,*
   No. C06 6510 TEH, 2007 WL 1302984 (N.D. Cal. May 3, 2007) ........................................... 14

*Johnson v. First Banks, Inc.,*
   889 N.E. 2d 233 (Ill. App. 2008) .......................................................................................... 4, 5

*Jordan v. Paul Fin., LLC,*
   745 F. Supp. 2d 1084 (N.D. Cal. 2010) .................................................................................. 13

*Ladd v. Warner Bros. Entm't, Inc.,*
   184 Cal. App. 4th 1298 (2010) ............................................................................................... 17

*McDonald v. Coldwell Banker,*
   543 F.3d 498 (9th Cir. 2008) ................................................................................................... 12

*Oakdale Village Group v. Fong,*
   43 Cal. App. 4th 539 (1996) .................................................................................................... 18

*Perdue v. Crocker Nat'l Bank,*
   38 Cal. 3d 913 (1985) .............................................................................................................. 16

*Pereira v. Regions Bank,*
   No. 6:12-cv-1383-Orl-22TBS, 2013 WL 265314 (M.D. Fla. Jan. 2, 2013) ........................ 4, 5

*Peterson v. Cellco Partnership*
   164 Cal. App. 4th 1583 (2008) ............................................................................................... 18

*Thompson v. Calderon,*
   151 F.3d 918 (9th Cir. 1998) (*en banc*) (Kleinfeld, J. concurring) ........................................... 5

*Uthe Tech. Corp. v. Aetrium, Inc.,*
   C 95-02377 WHA, 2012 WL 4470536 (N.D. Cal. Sept. 27, 2012) ........................................ 18

*Video Trax, Inc. v. NationsBank, N.A.,*
   33 F. Supp. 2d 1041 (S.D. Fla. 1998) *aff'd,* 205 F.3d 1358 (11th Cir. 2000) .................. 14, 15

*Waller v. Truck Ins. Exch.,*
   11 Cal. 4th 1 (1995) ................................................................................................................ 17

iii
TABLE OF AUTHORITIES

*Wells Fargo Bank of Tex., NA v. James,*
   321 F.3d 488 (5th Cir. 2003) ................................................................. 4, 5

*White v. Wachovia,*
   563 F. Supp. 2d 1358 (N.D. Ga. 2008) ............................................. 10, 17

**<u>Statutes</u>**

12 U.S.C. § 1831a(j)(1)............................................................................. 4

Cal. Civ. Code § 1761(b) ......................................................................... 14

Commercial Code § 4303(b) 1992 Amendment cmt. 7............................ 10, 16

**<u>Other Authorities</u>**

143 Cong. Rec. H3088-H3089 (daily ed. May 21, 1997).......................... 5

**<u>Rules</u>**

Fed. R. Civ. P. 12(c) ................................................................................. 2

<u>TABLE OF AUTHORITIES</u>

**INTRODUCTION**

Plaintiffs Amber Hawthorne, Christopher Kneer, and Victoria Kneer, on behalf of themselves and all others similarly situated ("Plaintiffs") allege that Defendant Umpqua Bank ("Umpqua" or the "Bank") made misrepresentations to them about the way the Bank ordered their debit card transactions. Plaintiffs' monthly statements—the document that Umpqua explicitly directs its consumers to carefully review to keep track of their finances—falsely represented that the customers' transactions were being ordered from lowest to highest. This was the exact *opposite* order that Umpqua actually used. In reality, the transactions were ordered, in undisclosed groups, from highest to lowest. Plaintiffs alleged that Umpqua did this in order to maximize the overdraft fees it could charge Plaintiffs and charge other overdraft fees even when Plaintiffs accounts were not overdrawn. That scheme, when implemented by Wells Fargo Bank, was described by the Honorable William Alsup as "motivated by avarice at the depositor's expense." *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1124 (N.D. Cal. 2010) ("*Gutierrez I*") *aff'd in part, rev'd in part and remanded sub nom. Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712 (9th Cir. 2012).

The Bank's misrepresentations also infected the Terms and Conditions that purportedly governed the Plaintiffs' relationship with the Bank. [Dkt. No. 15-2]. In those Terms and Conditions, Umpqua claimed that it would post the largest and "most important" transactions first. This was false. Instead, the Bank sorted only *certain* transactions high-to-low into one group, then sorted other transactions high-to-low in another group—another deliberate, but more subtle effort to increase overdraft fees. Similarly, the suggestion that this posting order was a benefit to the customers because "more important" items would be posted first is an outright lie. After a full trial in *Gutierrez*, Judge Alsup determined that a similar suggestion by defendant Wells Fargo was patently false because: (1) there could be no benefit in the case of electronic transactions (as opposed to checks), and (2) the resulting excessive overdraft fees were inescapable. *Gutierrez I*, 730 F. Supp. 2d at 1105. Thus, the Terms and Conditions' representation that more important items would be paid first under the Bank's posting order was false and misleading. This case is based on these and other affirmative misrepresentations made by the Bank.

Despite the fact that every claim in this case is grounded in affirmative misrepresentations, the Bank is asking the Court to grant judgment pursuant to Fed. R. Civ. P. 12(c). *See* Motion for Judgment on the Pleadings (the "Motion") [Dkt. No. 41]. The Motion is based almost entirely on the Ninth Circuit's ruling in the appeal of Judge Alsup's decision, *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712 (9th Cir. 2012). As discussed below, however, the Ninth Circuit upheld the claims against Wells Fargo that were premised on misrepresentations by the bank. Specifically, the Ninth Circuit found that whether a bank could order transactions high-to-low was exclusively governed by the National Bank Act of 1864 ("NBA"), 13 Stat. 99 (codified at 12 U.S.C. § 1 *et seq.*) and its implementing regulations. *Gutierrez*, 704 F.3d at 722-725. Thus, the plaintiffs' claims that high-to-low reordering violated a California law requirement that such ordering be done in "good faith" was contrary to, and preempted by, the NBA. *Id.* at 725 ("The federal court cannot mandate the order in which Wells Fargo posts its transactions."). On the other hand, the Ninth Circuit held that claims based on Wells Fargo's misleading statements about the posting order were not preempted because they do not interfere with the NBA's direct powers over banks, including disclosure requirements:

> As a non-discriminating state law of general applicability that does not "conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties," the Unfair Competition Law's prohibition on misleading statements under the fraudulent prong of the statute is not preempted by the National Bank Act.

*Id.* at 726. Although the Ninth Circuit did not address any other claims based on misleading statements other than California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"), the reasoning applies to all laws of general applicability that are based on affirmative misrepresentations—as opposed to claims that a posting order is itself unlawful or that the bank should have made certain disclosures.

On remand, Judge Alsup reaffirmed his $203 million damages award based on the "fraudulent" prong of §17200. The misrepresentations in that case are parallel to those here. Most notably, "the Wells Fargo online banking service displayed pending transactions to customers in chronological order, only to rearrange them in a high-to-low order at the time of posting in order to maximize the number of overdraft fees." *Gutierrez v. Wells Fargo Bank, N.A.*, C 07-05923 WHA,

1   2013 WL 2048030, at *2 (N.D. Cal. May 14, 2013) ("*Gutierrez II*").  Judge Alsup also ruled that

2   Wells Fargo's Consumer terms and conditions was "both difficult for customers to understand and

3   misleading."  *Id*. at *2.  Plaintiffs make the same allegations in the case at bar.

4        Even though Umpqua is not a national bank, it claims that the Ninth Circuit's decision in

5   *Gutierrez* serves to preempt all of the claims in this case except for the claim under the fraudulent

6   prong of §17200.  Even if the Court were to extend NBA preemption to Umpqua—it should not—

7   this would not preempt Plaintiffs claims.  Each of those claims (including the conversion, unjust

8   enrichment and breach of the duty of good faith and fair dealing) are premised on alleged

9   misrepresentations.  As such, the Ninth Circuit's preemption analysis establishes that those claims

10  are *not* preempted because they do not allege that the Bank was required to order the transaction in a

11  certain way, nor would they require any affirmative disclosures by the bank.  Instead, they are

12  claims seeking redress for affirmative misrepresentations based on state laws of general

13  applicability.

14                 **PROCEDURAL BACKGROUND**

15       Over one year ago, Judge Gonzalez Rogers denied Umpqua's Motion to Dismiss certain of

16  Plaintiffs' claims.  [Dkt. No. 30].  In that motion, Umpqua asked the court to dismiss Plaintiffs'

17  unjust enrichment, conversion, and unconscionability claims in their entirety, as well as claims

18  made by Plaintiffs under the "fraudulent" prong of California's UCL.  [Dkt. No. 19].  Umpqua did

19  not move to dismiss Plaintiffs' contract claims, nor its claims under the "unfair" or "unlawful"

20  prongs of the UCL.  *Id*.  Judge Gonzalez Rogers held that Plaintiffs' allegations that "the Bank used

21  misleading account agreements which falsely led customers to believe that overdraft fees would

22  only be charged when there were not sufficient funds in the account to cover a debit at the time it

23  was made" and that Umpqua made "misrepresentations regarding posting order in the Bank's

24  account statements that hide the Bank's high-to-low posting practices."  These misrepresentations

25  were sufficient to state claims for violations of the UCL's fraudulent prong and for unjust

26  enrichment and conversion.  [Dkt. No. 30] at 3.

27       The parties are currently engaged in discovery.  Umpqua now comes before this Court with

28  what is essentially another motion to dismiss.  For the first time in this litigation, Umpqua argues

1  that the six-month-old Ninth Circuit decision in *Gutierrez* means that all of Plaintiffs' claims—other

2  than their UCL "fraudulent" prong claim—are preempted.  Because Plaintiffs' claims in this case

3  are all predicated on alleged affirmative misrepresentations by the bank, those claims are not

4  affected by the Ninth Circuit's ruling in *Gutierrez*.

5  <center>**LEGAL STANDARD**</center>

6  The same standard of review is applicable to a motion under Rule 12(c) as a motion under

7  Rule 12(b).  *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir.1989). "[T]he

8  allegations of the non-moving party must be accepted as true . . . Judgment on the pleadings is

9  proper when the moving party clearly establishes on the face of the pleadings that no material issue

10  of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach*

11  *Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir.1990).

12  <center>**ARGUMENT**</center>

13  **A.     The FDIA's parity provision does not preempt state law claims of general applicability.**

14  Umpqua argues that, by operation of the Federal Deposit Insurance Act's ("FDIA") parity

15  provision at 12 U.S.C. § 1831a(j)(1), it may do business through its branches in California subject

16  only to the same restrictions and limitations as may be imposed on national banks.  That provision,

17  meant to ensure that national banks do not receive preferential treatment over state banks, is not

18  implicated here.  Instead, the parity provision merely provides that the host-state laws apply to

19  branches of out of state bank branches in those host states.  12 U.S.C. § 1831(a)(j)(1).  This is called

20  a parity provision because this is consistent with what the NBA provides for national banks.  That

21  parity provision—if anything—establishes that the California laws must govern Umpqua's activities

22  in California (where Plaintiffs reside), since California is the host state.  Notably, the parity

23  provision of the FDIA says nothing about preemption.

24  Umpqua's Motion strains to show that a state bank is, for preemption purposes, treated the

25  same as a national bank.  It does so by relying on three non-binding cases from outside this

26  jurisdiction: *Wells Fargo Bank of Tex., NA v. James*, 321 F.3d 488, 490 n.1 (5th Cir. 2003); *Johnson*

27  *v. First Banks, Inc.*, 889 N.E. 2d 233 (Ill. App. 2008); *Pereira v. Regions Bank*, No. 6:12-cv-1383-

28  Orl-22TBS, 2013 WL 265314 (M.D. Fla. Jan. 2, 2013).  The first two cases have no analysis of this

<center>-4-</center>

1    issue.  Indeed, the Fifth Circuit in the *Wells Fargo Bank of Tex.* case merely states in dicta contained

2    in a footnote that that the FDIA's parity provision provides for preemption.  *Wells Fargo Bank of*

3    *Tex.*, 321 F.3d at 490 n.1.  The only authority relied on by *Johnson* is the dicta (without analysis) in

4    the *Wells Fargo Bank of Tex.* case.  *See Johnson,* 889 N.E. 2d at 238.  The only case with any

5    analysis of this issue is *Pereira*, 2013 WL 265314, at *4.  Notably, *Pereira* acknowledges that there

6    is no clear indication that the parity provision of the FDIA provides for express preemption.  *Id.*  In

7    light of this "ambiguous" provision, the court resorted to statutory interpretation, including an

8    analysis of legislative history.  Like Umpqua, *Pereira* relied on the comments of a congressman

9    who stated that the parity act required out of state banks to comply with host-state laws "unless the

10   State law has been preempted (with respect to) national banks."  [Dkt. No. 41] at 6 (citing 143

11   Cong. Rec. H3088-H3089 (daily ed. May 21, 1997)).  This statement cannot be used to engraft

12   express preemption—something that must be spelled out explicitly by Congress—onto the FDIA.

13   *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 (1980) ("And

14   ordinarily even the contemporaneous remarks of a single legislator who sponsors a bill are not

15   controlling in analyzing legislative history.") (citation omitted); *Chrysler Corp. v. Brown*, 441 U.S.

16   281, 311 (1979) ("The remarks of a single legislator, even the sponsor, are not controlling in

17   analyzing legislative history."); *Am. Rivers v. F.E.R.C.*, 201 F.3d 1186, 1209 (9th Cir. 1999) ("We

18   accord this remark [by one senator] no interpretive weight.") (citing *Chrysler Corp.*, 441 U.S. at

19   311); *Thompson v. Calderon*, 151 F.3d 918, 928-29 (9th Cir. 1998) (*en banc*) (Kleinfeld, J.

20   concurring) ("individual senators do not make laws; majorities of the House and Senate do").

21         Even if these cases were correctly decided (they were not), their holdings are limited to a

22   "finding that Congress intended to preempt the imposition of *host-state banking laws* on out-of-state

23   state banks to the same extent that they are preempted as to out-of-state national banks."  *Pereira*,

24   2013 WL 265314, at *5 (emphasis added).  *See also Wells Fargo Bank of Tex.*, 321 F.3d at 490 n.1

25   (applying preemption to state "par value" statute that attempted to prohibit banks from charging

26   certain fees); *Johnson*, 889 N.E. 2d at 331 (holding that state law making banks liable for wrongful

27   dishonor of an item was preempted).  Plaintiffs here are not trying to invoke a host-state banking

28

-5-

1   law.  They are trying to invoke laws of generally applicability.  Plaintiffs can cite to no case holding

2   that the parity provision of the FDIA preempts such claims.

3          Even assuming that the FDIA parity provision provides Umpqua with the protections of

4   NBA preemption, no such preemption would apply here because Plaintiffs' claims are all premised

5   on affirmative misrepresentations.  And the Ninth Circuit has held that such claims are not

6   preempted by the NBA.

7   **B.      Each of Plaintiffs' claims is premised on Umpqua's misrepresentations relating to the**
   **         posting order of debit card transactions.**

8

9          Judge Gonzalez Rogers previously recognized that Plaintiffs' allegations of Umpqua's

10  misrepresentations were sufficient to establish the elements of the fraudulent prong of the UCL:

11  "The Court finds that the allegations here adequately allege a violation of the UCL's fraudulent

12  conduct prong.  Plaintiffs allege that the Bank used misleading Terms and Conditions which falsely

13  led customers to believe that overdraft fees would only be charged when there were not sufficient

14  funds in the account to cover a debit at the time it was made.  They also allege misrepresentations

15  regarding posting order in the Bank's account statements that hide the Bank's high-to-low posting

16  practices."  [Dkt. No. 30] at 3.  Specifically, Plaintiffs allege that Umpqua issued confusing,

17  contradictory, and deceptive Terms and Conditions, then doubled down on its deception by issuing

18  bank statements that blatantly misrepresented its true posting practices.

19         *First*, Umpqua misrepresented its true practices in its Overdraft Disclosure, telling plaintiffs

20  it "may" reorder transactions only if there were funds to pay those transactions.  Umpqua's

21  "Overdraft Disclosure," an addendum to the Terms and Conditions stated:

22             If there are funds to cover some but not all of the checks, withdrawals or other
             debits (such as charges) posting to your account, we *may* post these items, *for*
23            *which there are funds*, in any order we may choose at our sole discretion.

24  [Dkt. No. 15], ¶ 33 (emphasis added).  This provision states, in effect, that "for items for which

25  there are funds," Umpqua will pay *those* items "in any order."  In other words, Umpqua promised

26  Plaintiffs that it would, as a first step, isolate a group of transactions for which there were sufficient

27  funds, then pay those "in any order."  Plaintiffs allege that what Umpqua actually does, contrary to

28  this contractual promise, is determine what the largest item is, then determine if there are sufficient

-6-

1    funds for *that* item.  Even if there are not, Umpqua posts it anyway.[1]  This is the very sort of

2    confusing language that Judge Alsup found to be misleading in *Gutierrez II*, 2013 WL 2048030, at

3    *2 (holding that terms and conditions that were "difficult for customers to understand and

4    misleading" constituted misrepresentations).

5        **Second**, Umpqua's Terms and Conditions were also confusing and misleading.  For

6    example, the Terms and Conditions stated that Umpqua would treat all types of transactions equally,

7    when in fact it was using a sophisticated ordering scheme to pay certain types of transactions first in

8    order to maximize fees.  Umpqua falsely represented that it followed a simple, straightforward

9    reordering process:

> When processing checks or orders drawn on your account, our policy is to pay
> them according to the dollar amount.  We pay the largest dollar items first by
> transaction type.  If the small items are paid first, you may have fewer NSF or
> overdraft fees, but the largest, and perhaps most important items (such as rent or
> mortgage payments) might not be paid.  However, if the largest items are paid
> first, your most important items might be paid but it may increase the overdraft or
> NSF fees if funds are not available to pay all of the items.

14   [Dkt. No. 15], ¶ 37.  In fact, it used a complicated system of "bucketing" transactions into certain

15   categories, which were then prioritized in a manner to extract the greatest possible number of

16   overdraft fees.  *See id.*, ¶ 42 ("Umpqua chose to post certain 'transaction types' before others in

17   order to maximize overdraft fee revenues[.]").  For this reason, these confusing and misleading

18   provisions of Terms and Conditions amounted to misrepresentations.

19       The Terms and Conditions also characterize the largest transactions are the "most important"

20   ones, and claim the Bank's posting practices will ensure these important transactions are paid first.

21   That implies that Umpqua would modify any posting order on a case-by-case basis to ensure the

22   most important transactions were paid first.  That did not happen.  As Judge Alsup found in

23   *Gutierrez I*, there is no benefit to the consumers in paying debit card transactions in a high-to-low

24   order.  While that argument may have some merit with checks, which could be declined, the debit

25

26   [1] To use a simple example: a customer has a $100 balance in her checking account, and 4 incoming
transactions for $1000, $500, $50, and $20.  The contractual term reproduced above means that

27   Umpqua was first required to determine which of the items are "items for which there are funds."
In the example, the only items that qualify are the $50 and $20 items.  Per the contract, then,

28   Umpqua must pay *those* transactions first, "in any order."  Instead, Umpqua would pay the $1000
and $500 first.

card transactions at issue here are "must pay" items.  Thus, no matter what posting order the Bank uses, those transactions (important, unimportant, large, or small) will be paid.  Thus, the suggestion that high-to-low reordering confers a benefit on the consumers is false and misleading:

> The supposed net benefit of high-to-low resequencing is utterly speculative. Its bone-crushing multiplication of additional overdraft penalties, however, is categorically assured. Thus, wholly apart from the fact that the rationalization has no applicability to debit-card transactions (due to their "must pay" aspect), the net harm to depositors from the practice is so plain and so vast that this order rejects completely that high-to-low resequencing is a net benefit to depositors or preferred by them.

*Gutierrez I*, 730 F. Supp. 2d at 1105.

The Terms and Conditions also advised customers to "make careful records and practice good account management," because such care "will help you to avoid writing checks or drafts without sufficient funds and incurring the resulting fees."  Judge Alsup explicitly found that encouraging customers to use check registers to avoid overdraft fees "promoted a false perception" because even a "precise register could never alert a customer who makes a mistake that her one overdraft will be converted into as many as ten overdrafts."  *Id*. at 1105.

**Finally**, the most blatant misrepresentations were made in the very documents that Umpqua claimed (in its Terms and Conditions) that the customers were required to review.  [Dkt. No. 15-2] at 2 ("You *must* examine your statement of account with 'reasonable promptness.'") (emphasis added).  When Plaintiffs did as directed, and examined their account statements, they were confronted by a bald-faced lie.  Namely, monthly bank statements Umpqua issued showed "smaller dollar items—not larger dollar items . . . being paid first . . . [Therefore,] when an Umpqua customer views his or her account statement, they are looking at a total fabrication[.]"  [Dkt. No. 15], ¶ 38. This, it must be noted, is despite contractual provisions which indicate Umpqua will provide *accurate* bank statements [Dkt. No. 15-2], at 3.  In short, Umpqua rearranged transactions on bank statements to conceal its true posting practices.

As Judge Gonzalez Rogers stated in finding that Plaintiffs had adequately made UCL "fraud" allegations, Plaintiffs "allege misrepresentations regarding posting order in the Bank's account statements that hide the Bank's high-to-low posting practices."  [Dkt. No. 30], at 2.  This is precisely the sort of misrepresentation that Judge Alsup recently found formed part of the basis for

1    reinstating the $203 million judgment against Wells Fargo.  *Gutierrez II*, 2013 WL 2048030, at *2

2    (finding that "Wells Fargo made misleading statements directly to customers," including that "the

3    Wells Fargo online banking service displayed pending transactions to customers in chronological

4    order, only to rearrange them in high-to-low order at the time of posting in order to maximize the

5    number of overdraft fees."); *see also Gutierrez I*, 730 F. Supp. 2d at 1117 ("Furthermore, when a

6    customer used Wells Fargo's online banking service, the bank would display 'pending' debit-card

7    purchases in chronological order, leading customers to believe that the processing would take place

8    in that order.  In reality, debit-card purchases were never posted in this order during the class period,

9    as the bank well knew.  Nothing on the bank's online-banking website warned customers that the

10   pending transactions, displayed chronologically to them, would be resequenced behind the scenes

11   and posted in high-to-low order to maximize overdrafts.").

12          These affirmative misrepresentations form the basis for Plaintiffs' UCL claims, conversion

13   claims, unjust enrichment claims, and claims for the breach of the duty of good faith and fair

14   dealing.

15   **C.   *Gutierrez* did not preempt claims based on misrepresentation, fraud, or concealment.**

16          While the Ninth Circuit's decision in *Gutierrez* held that state law claims based *solely* on a

17   bank's implementation or inadequate disclosure of a high-to-low posting order are preempted under

18   the National Bank Act, it made clear that claims based on a bank's misrepresentations as to the

19   posting order utilized are *not* preempted.  *Gutierrez*, 704 F.3d at 718.  Because Plaintiffs' claims

20   here are based on Umpqua's misrepresentations about its posting order, and because Plaintiffs

21   allege that they were harmed as a result of Umpqua's misleading statements regarding the posting

22   order, their state law claims based on such misrepresentations are not preempted.  Thus, *Gutierrez*

23   militates against judgment on the pleadings.

24          The Ninth Circuit essentially found fault with the part of the lower court's ruling that the

25   high-to-low resequencing was *per se* unlawful under the UCL or that Wells Fargo was required to

26   make any particular affirmative disclosures.  "The federal court cannot mandate the order in which

27   Wells Fargo posts its transactions."  *Id.*, at 725.  But while Umpqua focuses on what the Ninth

28   Circuit found preempted in *Gutierrez*, it ignores the lower court's key holding that the Ninth Circuit

-9-

1   left standing; namely, that  not even a national bank (which is clearly subject to the NBA's express

2   preemption provision) is free to disregard the basic duties to avoid fraud, deception, and other basic

3   common law duties:  "California's prohibition of misleading statements does not significantly

4   interfere with the bank's ability to offer checking account services, choose a posting method, or

5   calculate fees."  *Gutierrez*, 704 F.3d at 727 (citations omitted).  The panel also emphasized that

6   "[f]ederal law does not . . . preempt California consumer law with respect to fraudulent or

7   misleading representations concerning posting."  *Id*., at 716.  Nor did the panel in any way reverse

8   or criticize Judge Alsup's holding that Wells Fargo violated the covenant of good faith and fair

9   dealing.  Specifically, Judge Alsup held that "having delegated itself discretion [under the

10  contract]," Wells Fargo had  "the duty to exercise that discretion in accordance with the covenant of

11  good faith and fair dealing.  This precludes exercising that discretion to turn what would ordinarily

12  be one overdraft into as many as ten."  *Gutierrez I*, 730 F. Supp. 2d at 1122.

13          Plaintiffs in *Gutierrez* had claimed that Wells Fargo's "resequencing" practices were

14  "unfair" under the UCL because they contradicted the legislative policy expressed in California

15  Commercial Code § 4303(b) 1992 Amendment cmt. 7 ("Comment 7")—a provision that prohibited

16  banks from choosing a post order in order to maximize overdraft fees.  The panel held that claims

17  based on such a state law, targeted specifically at banks, were preempted by the NBA.  Plaintiffs in

18  the instant case make no claim based on that prohibition.  In fact, they make no reference to

19  Comment 7 in their complaint.  *See* Dkt. No. 15.  None of the claims Plaintiffs make here require

20  this Court to find that Umpqua's posting practices are *per se* unlawful, unfair,  deceptive, or in

21  violation of Comment 7.

22          Indeed, the Ninth Circuit's ruling is completely consistent with the thoughtful decision by

23  the United States District Court for the Northern District of Georgia.  *White v. Wachovia*,

24  563 F. Supp. 2d 1358 (N.D. Ga. 2008).  In that case, the Honorable Beverly Martin (now serving on

25  the Eleventh Circuit) found that claims sounding in tort and contract were not preempted by the

26  NBA because they did not interfere with the bank's deposit-taking powers.  Unlike the "unlawful"

27  and "unfair" allegations in *Gutierrez*, which were based on Comment 7 (a state law that arguably

28  made high-to-low reordering unlawful), the claims in *White* and in all of the other high-to-low cases

1   across the country are based on general tort and contract law that prevent banks from saying one

2   thing and doing another.

3   While the Ninth Circuit's decision affirmed Judge Alsup's factual findings, including that

4   Wells Fargo had made misrepresentations that deceived plaintiffs, it vacated the judgment and

5   instructed the lower court to reevaluate both damages and injunctive relief in light of the panel's

6   preemption decision.  On remand, Judge Alsup reinstated his original judgment in full.  *Gutierrez II,*

7   2013 WL 2048030.  That decision found that "[o]ur court of appeals held that [the UCL] is a non-

8   discriminatory state law of general applicability that did not impose disclosure requirements in

9   conflict with federal law.  Rather, it prohibited statements that are likely to mislead the public."

10  *Gutierrez II*, 2013 WL 2048030 at *2.  After restating the portions of his post-trial determination

11  that Wells Fargo had affirmatively deceived plaintiffs—including by misstatements in marketing

12  materials, contract materials, and on online bank statements—Judge Alsup ordered the same

13  injunctive relief and damages he had ordered the first time around.

14  **D.   The Ninth Circuit's *Gutierrez* Decision Provides No Support for Judgment on the Pleadings.**

15

16  The Ninth Circuit's decision in *Gutierrez* dealt solely with alleged violations of the UCL;

17  the ruling did not concern the state common law claims for breach of contract and breach of the

18  covenant of good faith and fair dealing, conversion and unjust enrichment at issue in the instant

19  lawsuit.  As for California's UCL—what it termed a "consumer protection statute of general

20  applicability," *Gutierrez*, 704 F.3d at 722—the panel held that, as a general matter, it did not

21  interfere with banking powers and was *not* preempted.  Indeed, the *Gutierrez* panel reinforced the

22  fact that state laws can be applied to limit the activities of national banks:

23  > Notably, the Unfair Competition Law itself does not impose disclosure
   > requirements but merely prohibits statements that are likely to mislead the public.
24  > As a non-discriminating state law of general applicability that does not "conflict
   > with federal law, frustrate the purpose of the National Bank Act, or impair the
25  > efficiency of national banks to discharge their duties," the Unfair Competition
   > Law's prohibition on misleading statements under the fraudulent prong of the
26  > statute is not preempted by the National Bank Act.

27  *Id*. at 726.

28

-11-

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

Those claims—under laws of general applicability—are precisely the ones Plaintiffs make here.  And if such claims are not preempted when made under the UCL, neither are they preempted when couched as common law claims.  Yet Umpqua argues that they are barred by preemption.  The Ninth Circuit rejected the same argument by Wells Fargo.  Specifically, the Ninth Circuit rejected Wells Fargo's argument "that a state law prohibiting misleading statements necessarily touches on 'checking accounts'" because "such an expansive interpretation—with no limiting principle— 'would swallow all laws.'"  *Id.* at 727 (quoting *Aguayo v. U.S. Bank*, 653 F.3d 912 (9th Cir. 2011).  This Court should reject Umpqua's attempt to use narrowly tailored preemption to "swallow all" of Plaintiffs' claims made under state laws of general applicability.

### 1.   Plaintiffs' "unlawful" and "unfair" prong UCL claims are not preempted.

In its Motion, Umpqua argues that Plaintiffs' unlawful and unfair prong UCL claims (though not their fraudulent prong claim) are preempted.  Dkt. No. 41, at 14.  Plaintiffs concede that *Gutierrez* requires them to prove each of their claims without reference to allegations that the high to low practice was *per se* unfair or deceptive.  In other words, each of Plaintiffs' claims must be tethered to some misrepresentation by Umpqua about its posting practices.  As discussed below, Plaintiffs can meet this burden.  To the extent Plaintiffs had, prior to *Gutierrez*, made allegations that Umpqua's posting practices were *per se* unfair, those allegations provide no support for the causes of action in this case.  But even without those allegations, Plaintiffs adequately allege non-preempted claims for violations of each of the UCL's three prongs: "unlawful," "unfair," and "fraudulent."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (citations omitted).

### a.   "Unfair" prong.

An unfair business practice under the UCL is "one that either offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *McDonald v. Coldwell Banker,* 543 F.3d 498, 506 (9th Cir. 2008) (omitting internal citations).  To test whether a business practice is unfair, the Court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim.  *Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1268 (2006).  Plaintiffs concede that they cannot maintain an action under the

1    UCL's unlawful prong based on allegations that Umpqua's posting order was *per se* deceptive or

2    unconscionable, or that it was required to make any particular affirmative disclosures.  Nonetheless,

3    Plaintiffs have alleged a claim that is not preempted, because they claim that Umpqua's

4    misrepresentations are immoral, unethical, oppressive, unscrupulous, or substantially injurious to

5    consumers.  [Dkt. No. 15] ¶¶ 122-127.  In the "unfairness" balancing test that this Court is obligated

6    to undertake, there is no possible utility in lying about posting order, as Umpqua did on its bank

7    statements and in its contract documents.

8         Misrepresentations or deceptions can form the basis for both a UCL fraud and a UCL

9    "unfairness" claim.  For example, in *Boschma v. Home Loan Ctr., Inc.*, 198 Cal. App. 4th 230, 253

10   (2011), plaintiff made claims predicated on partial omissions by a lender in connection with option

11   adjustable rate mortgage loans.  "Plaintiffs' 'unfair' allegations also focus on the same material

12   omissions/misleading disclosures in the loan documents."  *Id*.  The court criticized the lender's

13   "byzantine descriptions" of the loan terms, which were "hidden in the complexity" of the various

14   loan documents.  *Id*. at 249.  The court found that such misrepresentations formed the basis for a

15   UCL fraudulent prong claim, as well as a "unfair" prong claim, even where "Plaintiffs' 'unfair'

16   allegations also focus on the same material omissions/misleading disclosures in the loan

17   documents" as in their fraud prong claim.  *Id*. at  253.  Similarly, in *Jordan v. Paul Fin., LLC*, 745

18   F. Supp. 2d 1084, 1099 (N.D. Cal. 2010), where "plaintiffs' complaint relie[d] entirely on the face

19   of the loan documents," the court held that plaintiffs had adequately stated claims under both the

20   unfair and fraudulent prongs of the UCL.  For the same reasons, the allegations of

21   misrepresentations by Plaintiffs in this case can be used to satisfy both the fraudulent and unfair

22   prongs of the UCL.

23         **b.      "Unlawful" prong**

24         Under the UCL's "unlawful" prong, violations of other laws are "borrowed" and made

25   independently actionable under the UCL.  *Cel–Tech.,* 20 Cal. 4th at 180.  California Consumer

26   Legal Remedies Act ("CLRA") violations may serve as the predicate for "unlawful" business

27   practice actions under the UCL.  *Collins v. eMachines, Inc.,* 202 Cal. App. 4th 249, 258 (2011),

28   *reh'g denied* (Dec. 15, 2011), *as modified* (Dec. 28, 2011), *review denied* (Feb. 15, 2012).  Plaintiffs

-13-

allege that Umpqua's practices relating to the imposition of overdraft fees violate the CLRA, specifically section 1770(a)(19) (inserting an unconscionable provision in the contract), 1770(a)(5) (representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have), 1770(a)(14) (representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve), and 1770(a)(1) (passing off goods or services as those of another).   [Dkt. No. 15], ¶ 123.  Plaintiffs allege these CLRA violations constitute unlawful business acts or practices within the meaning of the UCL.  *Id*.

Defendants now argue that these CLRA provisions—the only ones Plaintiffs relied on for their UCL unlawful prong claim—are not applicable to financial transactions because the latter are not a "good or service."  The CLRA defines "services" as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods."  Cal. Civ. Code § 1761(b).  Plaintiffs complain about disclosures on the overall functioning of their checking accounts and debit cards—these constitute financial services under the CLRA. *See, e.g., Hitz v. First Interstate Bank,* 38 Cal. App. 4th 274, 286-88 (1995) (credit card agreements encompass convenience services *in addition to* an extension of credit and that, therefore, such agreements qualify as contracts for "services" under a non-CLRA statute); *Hernandez v. Hilltop Financial Mortgage, Inc.,* 622 F. Supp. 2d 842, 850-51 (N.D. Cal. 2007) (loan services, though not the loan itself, fell within the ambit of the CLRA).  In *Jefferson v. Chase Home Finance LLC,* No. C06 6510 TEH, 2007 WL 1302984, at *3 (N.D. Cal. May 3, 2007) (improper application of prepayments to mortgage were "financial services").

It is true that the extension of credit is not a good or service. But overdraft fees are not credit.  Instead, they are treated as administrative charges: "case law exists which distinguishes loans from check transactions, and compels a determination that the payment of checks against an overdrawn account is not an extension of credit, and that the OD fee charged for such services is not interest."  *Video Trax, Inc. v. NationsBank, N.A.*, 33 F. Supp. 2d 1041, 1053 (S.D. Fla. 1998) *aff'd*, 205 F.3d 1358 (11th Cir. 2000).  Further, "[t]he implementation of OD and NSF fees was based on the banking industry's awareness that a depositor often writes checks under the mistaken belief that he has, or will have, sufficient funds to cover the check, *without any intent to apply for credit*. The

-14-

imposition of the fee is solely contingent on the depositor's failure to comply with the terms of the deposit agreement[.]" *Id.* at 1054 (emphasis added). A recent state court decision in an identical overdraft fee litigation found that, contrary to defendant arguments, checking account overdraft fees were "goods and services" under their states' consumer protection statutes. *See Jonathan Jones, et al. v. United Bank and United Bankshares, Inc.* (No. 11-C-50) (Circuit Court, Jackson County, West Virginia) (Sept. 28, 2011).

None of the cases Umpqua cites addresses the distinction, drawn by the *Video Trax* court, "between interest and administrative charges." *Video Trax*, 33 F. Supp. 2d at 1041. The first case Umpqua relies on, *Consumer Solutions REO, LLC v. Hillery*, 658 F. Supp. 2d 1002, 1015 (N.D. Cal. 2009), concerns a mortgage loan. In finding that loan to be outside the scope of the CLRA, the court cited *Berry v. American Express Publishing, Inc.,* 147 Cal. App. 4th 224 (2007), which held that "*extension of credit, such as issuing a credit card*, separate and apart from the sale or lease of any specific goods or services, does not fall within the scope of the [CLRA]" (emphasis added). Similarly, the court in *Ball v. FleetBoston Fin. Corp.*, 79 Cal. Rptr. 3d 402, 404-405 (2008), another case cited by Umpqua, had a similar focus on the extension of credit: "the act of extending credit alone is not covered by the CLRA." No extension of credit is at issue here. What are at issue are the checking account and debit card services offered by Umpqua. A checking account provides the service not of a *loan,* but of allowing Plaintiffs convenient access to their own money in diverse locations and times.

While it is true that Judge Alsup granted Wells Fargo's summary judgment motion with respect to plaintiff's CLRA claim, it did so because "Plaintiffs have not identified the purported [CLRA] good or service here." *Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946, 957 (N.D. Cal. 2009). Plaintiffs here identify the provision of checking accounts and debit cards as the relevant service. At the very least, Plaintiffs must be provided the opportunity, as the *Gutierrez* plaintiffs were, to build a record showing that they are indeed a "service." Therefore, even if this Court disagrees as a matter of law with the holding in *VideoTrax*, *Hernandez*, and *Jefferson*, it is premature to dismiss Plaintiffs' CLRA claim at this stage, without a factual record.

2.     **Plaintiffs' breach of the covenant of good faith and fair dealing claims are not preempted.**

Umpqua argues that "[t]he rationale of *Gutierrez* applies with equal force to Plaintiffs' claim for the breach of the implied covenant of good faith and fair dealing."  [Dkt. No. 41], at 11.  According to Umpqua, an implied covenant claim would impose a "good faith limitation" on Umpqua's pricing decision to set overdraft fees, in the same way the *Gutierrez* panel determined Cal. Com. Code § 4303(b), Calif. cmt. 7 did.  But as discussed above, the dual "rationale" of the *Gutierrez* decision is that statutes *directed at* banks that interfere with pricing decisions are preempted, and also that no business (bank or not) is free to avoid basic duties to avoid fraud, deception, or other basic common law duties: "California's prohibition of misleading statements does not significantly interfere with the bank's ability to offer checking account services, choose a posting method, or calculate fees."  *Gutierrez*, 704 F.3d at 727.  By that rationale, the implied covenant claim also does not interfere with Umpqua's "pricing determinations."  Plaintiffs' implied covenant claim merely demands that Umpqua, like every other contracting party in California, be required to exercise contractual discretion in good faith.

Nor is it true that, as Umpqua argues, Judge Alsup considered the UCL claim as "derived from" the implied covenant claim.  Rather, the court made clear that the implied covenant claim is separate and distinct from a claim based on the UCC legislative comment.  *Gutierrez I*, 730 F. Supp. 2d at 1122 (citing *Perdue v. Crocker Nat'l Bank,* 38 Cal. 3d 913, 923 (1985), a case about overdraft fees, for the proposition that "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise the discretion in good faith and in accordance with fair dealing.").

Plaintiffs allege that Umpqua explicitly reserved for itself various types of discretion in the contract documents.[2]  The covenant of good faith and fair dealing, implied by California law in

---

[2] In the Overdraft Disclosure, Umpqua stated:  "If there are funds to cover some but not all of the checks, withdrawals or other debits (such as charges) posting to your account, *we may pay these items*, for which there are funds, *in any order we may choose* at our sole discretion" (emphasis added).  [Dkt. No. 15], ¶ 33.  The Terms and Conditions also states that "*we may, at our discretion,* honor withdrawal requests that overdraw your account" (emphasis added).  [Dkt. No. 15], ¶ 34.

every contract, requires a party to use such discretion fairly.  *Guz v. Bechtel Nat'l, Inc.,* 24 Cal. 4th 317, 349 (2000). "The covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement" even if it does not technically violated the express terms of the agreement.  *Waller v. Truck Ins. Exch.,* 11 Cal. 4th 1, 36 (1995).  *See also Ladd v. Warner Bros. Entm't, Inc.,* 184 Cal. App. 4th 1298, 1308 (2010) (party violated duty by using a fee computation method that unfairly undervalued fees owed, even if there was no express contractual obligation to calculate them differently).

The covenant of good faith and fair dealing, in sum, is a law of general applicability, one of our society's background rules of the road that all businesses must follow.  Unlike the UCC provision struck down by the Ninth Circuit in *Gutierrez*, it is a good faith command *moored to a contract*.  It is a principle of contract interpretation from which banks receive no special exemption. *See White*, 563 F. Supp. 2d at 1358 (claim for breach of implied covenant of good faith and fair dealing not preempted as to national bank); *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1313 (S.D. Fla. 2010) (same).  It is therefore simply a confusion of concepts for Umpqua to say that by their covenant claim, "Plaintiffs . . . seek to impose a good faith limitation" on a bank's activities in the same way Gutierrez' UCC-based UCL claim did.  To the contrary, Plaintiffs seek only to impose a good faith limitation *on the contract* Umpqua drafted for itself.  That contract contained various discretion points.  This court must interpret those discretion points fairly, or the contract as a whole would become meaningless, subsumed by Umpqua's unfettered discretion to do whatever it likes.

### 3.    Plaintiffs' unjust enrichment and conversion claims are not preempted.

As discussed above, Plaintiffs claim Umpqua defrauded and deceived them when it misrepresented and concealed its debit posting practices.  Plaintiffs' unjust enrichment and conversion claims are based on the same misrepresentations, and do not require this Court to find that Umpqua's posting order was *per se* unlawful or unfair.  Umpqua appears to concede as much, since it agrees that this Court has found Plaintiffs have adequately alleged a UCL fraudulent claim, and that claim is not preempted. [Dkt. No. 41], at 2.  That is a major concession, because the same

wrongful conduct (misrepresentations about posting order) can also be the basis for non-preempted unjust enrichment and conversion claims.

An unjust enrichment claim requires that the retention of the benefit be unjust due to some wrongful conduct. *Peterson v. Cellco Partnership* 164 Cal. App. 4th 1583 (2008). Similar logic applies to a conversion claim: "The elements of a conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion *by a wrongful act* or disposition of property right; and damages." *Oakdale Village Group v. Fong*, 43 Cal. App. 4th 539, 543–544 (1996) (emphasis added); *Uthe Tech. Corp. v. Aetrium, Inc.,* C 95-02377 WHA, 2012 WL 4470536 (N.D. Cal. Sept. 27, 2012). By simple logic, therefore, Umpqua also concedes the conversion and unjust enrichment claims are not preempted.

Umpqua argues that this simple syllogism is undone by *Baptista v. JP Morgan,* 2010 WL 2342436 (M.D. Fla. 2010), which concerned a Florida law specifically directed at banks. The court, not surprisingly, found that law preempted. Unlike Plaintiffs in this case, however, plaintiff in *Baptista* had no basis for his common law claims other than the violation of the preempted state law, and therefore those common law claims were preempted as well. That is not the case here, where Plaintiffs have alleged fraud, deception, and misrepresentation—and where Umpqua concedes those allegations are not preempted. Because Plaintiffs' misrepresentation allegations can support both their UCL and common law claims, judgment on the pleading cannot be granted on any of them.

**E.   Plaintiffs adequately allege an express breach of contract.**

Umpqua does not argue that Plaintiffs' express breach of contract claim is preempted. Instead, it argues that "there can be no breach of contract where the conduct complained of is authorized by the agreement at issue." [Dkt. No. 41], at 16. But as discussed at length in section A.1, *supra*, the Terms and Conditions and Overdraft Disclosure both misrepresent Umpqua's true posting and overdraft fee practices. Specifically, the Overdraft Disclosure misrepresents how Umpqua decides whether or not transactions are ones "for which there are funds," and Plaintiffs also allege that Umpqua misrepresented its true practices in the Terms and Conditions when it stated that it would pay "the largest dollar items first by transaction type" and would pay the "most

important" transactions first.  Each of these misrepresentations provide the basis for a breach of express contract claim.

## **CONCLUSION**

For the foregoing reasons, this Court should not grant judgment on the pleadings on any of Plaintiffs' claims.

Dated: May 28, 2013                              Respectfully submitted,


/s/ Hassan A. Zavareei
Hassan A. Zavareei (SBN 181547)
hzavareei@tzlegal.com
**TYCKO & ZAVAREEI, LLP**
2000 L Street, N.W., Suite 808
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

Jeffrey M. Ostrow (*pro hac vice*)
ostrow@kolawyers.com
**KOPELOWITZ OSTROW, P.C.**
200 SW 1st Avenue, 12th Floor
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
Fax:  (954) 525-4300

Byron T. Ball (SBN 10195)
btb@balllawllp.com
**THE BALL LAW FIRM, L.L.P.**
10886 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90024
Tel: (310) 446-6148
Fax: (310) 441-5386

*Counsel for Plaintiffs and the Proposed Classes*

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

**CERTIFICATE OF SERVICE**

I, Hassan Zavareei, counsel for the Plaintiffs, hereby certify on May 28, 2013 that I have served a true and correct copy of the foregoing via the Court's ECF system.




    /s/ Hassan A. Zavareei
**Hassan A. Zavareei**

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS