UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMBER HAWTHORNE, et al.,

    Plaintiffs,

v.

UMPQUA BANK,

    Defendant.

Case No.  11-cv-06700-JST

**ORDER GRANTING IN PART AND DENYING IN PART UMPQUA BANK'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Re:  ECF No. 40

Plaintiffs brought this putative class action alleging various violations of state law in connection with Umpqua's practice of assessing overdraft charges on customers' debit card transactions.  Defendant Umpqua Bank ("Umpqua") now moves for judgment on the pleadings. For the reasons set forth below, the motion is granted in part and denied in part.

I.    **BACKGROUND**

    A.    **Factual Allegations**

    For purposes of resolving this motion, all the "material allegations of the complaint are accepted as true, as well as all reasonable inferences to be drawn from them."  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  See § II, infra.

    Plaintiffs filed this proposed national class action in December 2011 against Umpqua Bank for (1) breach of contract and the covenant of good faith and fair dealing, (2) unconscionability, (3) conversion, (4) unjust enrichment, and (5) violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq. (on behalf of a California subclass).  ECF No. 1. The operative Second Amended Complaint ("SAC") alleges that Umpqua Bank misled its customers by representing that transactions post to their checking accounts in chronological order when, in fact, Umpqua Bank reorders them to maximize the number of transactions that result in

1  overdraft fees, "a major profit center."  SAC, ECF No. 56 ¶¶ 2, 5.

2  The SAC alleges that Umpqua is notified electronically when customers use their debit

3  cards, either in a transaction or to withdraw cash from ATMs.  Id. ¶ 30.  Umpqua "employs

4  sophisticated software to automate its overdraft system.  This program maximizes the number of

5  overdrafts, and thus, the amount of overdraft fees charged per customer."  Id. ¶ 31.  Because

6  Umpqua assesses overdraft fees for each draw on a checking account without sufficient funds to

7  cover the draw, the order in which the transactions are posted to the account can, in certain

8  circumstances, dictate the number of overdraft fees.  Id. ¶ 32.  Figures 1A and 1B illustrate how

9  the same set of transactions posted chronologically (1A) or re-ordered at the end of the day in

10  descending order of amount (1B) can result in either one overdraft fee (1A), or five (1B):

United States District Court
Northern District of California

| Transactions Posted Chronologically | | |
|---|---|---|
| Transaction | Amount | Balance |
| Starting Balance | - | $50 |
| Small Purchase | $9 | $41 |
| ATM Withdrawal | $20 | $21 |
| Online Shopping | $6 | $15 |
| Check | $10 | $5 |
| Large Purchase | $100 | ($95) |
| **Figure 1A** | | |

| Transactions Re-Ordered High-to-Low | | |
|---|---|---|
| Transaction | Amount | Balance |
| Starting Balance | - | $50 |
| Large Purchase | $100 | ($50) |
| ATM Withdrawal | $20 | ($70) |
| Check | $10 | ($80) |
| Small Purchase | $9 | ($89) |
| Online Shopping | $6 | ($95) |
| **Figure 1B** | | |

22  See id. ¶ 32.

23  The "Overdraft Disclosure" contained in Umpqua Bank's checking account holder

24  agreements during the class period contained disclosures such as: "If there are funds to cover some

25  but not all of the checks, withdrawals or other debits (such as charges) posting to your account, we

26  may pay these items, for which there are funds, in any order we may choose at our sole

27  discretion."  Id. ¶ 33; ECF No. 15 ("FAC"), Ex. A.  The relevant account holder agreements state

28

2

that Umpqua Bank has discretion as to when to post transactions and whether to honor transactions when there are insufficient funds to cover them.  SAC ¶ 35.  The account agreement itself ("Terms and Conditions of Your Account") states that Umpqua Bank is permitted by law to "pay items drawn on your account in any order," and, with respect to the order, states: "When processing checks or orders drawn on your account, our policy is to pay them according to the dollar amount.  We pay the largest dollar items first by transaction type."  Id. ¶ 37; FAC, Ex. B p. 3.  In addition, the Terms and Conditions contain the following disclosure:

> If the smallest items are paid first, you may have fewer NSF or overdraft fees, but the largest, and perhaps more important items (such as rent or mortgage payments) might not be paid.  However, if the largest items are paid first, your most important items might be paid but it may increase the overdraft or NSF fees if funds are not available to pay all of the items.

Id.

The SAC alleges that the account agreement and customers' monthly statements are inconsistent, rendering one or the other fraudulently misleading.  The monthly statements are ordered from smallest to largest transaction, and they do not contain a running balance.  SAC ¶ 38.  As a result, customers cannot determine why Umpqua assessed an overdraft fee, which transaction triggered it, or what posting order Umpqua used.  Id. ¶ 48.  In addition, Plaintiffs allege that Umpqua Bank's account agreement is misleading because it states that Umpqua will assess an overdraft fee "when funds are not available to pay all of the items" when, in fact, it sometimes assesses overdraft fees when the account does contain sufficient funds at the time of the transaction.  Id. ¶ 39.

Further, Plaintiffs allege that Umpqua Bank's account agreements and checking account statements are misleading because Umpqua's reordering practices extend beyond the reordering of transactions at the end of each day.  According to Plaintiffs, Umpqua groups together debit card transactions from more than one day so as to post larger transactions from subsequent days before smaller, earlier transactions.  Id. ¶ 40.  For example, Plaintiff Amber Hawthorne ended the day of June 29, 2010 with an account balance of $104.26.  Id. ¶ 53.  The next day, Umpqua

posted two debit card transactions to her account, one for $254.17 and the other for $12.  They were posted in that order, even though the smaller transaction occurred a day earlier than the larger one.  Consequently, Hawthorne was assessed two $35 overdraft fees instead of one.  Id. Those transactions were subsequently listed in low-to-high order on her monthly statement. Similarly, several transactions that Hawthorne made between July 2, 2010 and July 6, 2010 were grouped together, reordered high-to-low, and posted on July 6, 2010.  Id. ¶ 55.  On July 2, Hawthorne's account balance was $520.84.  In the subsequent four days, she made one purchase for $400, one for $120, and four purchases each smaller than $100.  The six transactions were ordered low-to-high on Hawthorne's statement, but posted high-to-low on July 6, resulting in four $35 overdraft fees.  Id. ¶¶ 55–56.  The SAC contains several similar examples of multi-day grouping and reordering.

Plaintiffs also allege that Umpqua's representation that it reorders transactions in order to ensure that "important" debits such as rent or mortgage payments is fraudulently misleading because (1) Umpqua's reordering practices do not actually benefit its customers, (2) Umpqua does not actually take into account the transaction type in reordering transactions, either en masse or on a case-by-case basis, and (3) because Umpqua's reordering practices are more complicated and do not strictly reorder transactions high-to-low for any given time period.  Id. ¶ 43.

Plaintiffs further allege that Umpqua "provides inaccurate balance information to its customers through its electronic network," informing customers "that they have a positive balance when, in reality, they have a negative balance, despite the Bank's actual knowledge of outstanding debits and transactions."  Id. ¶ 70.  This practice has the logical effect of increasing the number of overdraft fees against customers' accounts, because they are unaware that a transaction will put their account into the red.

Finally, Plaintiffs allege that Umpqua assesses overdraft fees when an authorization hold at the point of sale pushes an account past zero, even though such holds are often larger than the actual amount of the purchase.  Id. ¶¶ 73–74.  Authorization holds are designed to ensure that the customer has sufficient funds to make the purchase in cases where the merchant will not settle the

4

transaction with the bank until later.  Id.  Nothing in Umpqua's account agreement alerts customers that overdraft fees will not only be assessed when there are insufficient funds in an account, but also when an authorization hold, the amount of which is unilaterally set by the merchant and rarely communicated to the customer, exceeds the account balance.  Id.

**B.     Order Granting in Part and Denying in Part Umpqua Bank's Motion to Dismiss**

After Plaintiffs filed their First Amended Complaint by stipulation, ECF No. 14, Umpqua Bank moved to dismiss Plaintiffs' claims of unconscionability, conversion, unjust enrichment, and violation of the "fraudulent" prong of the UCL.  ECF Nos. 18–19.

Judge Gonzalez Rogers issued a tentative ruling granting in part and denying in part Umpqua Bank's motion to dismiss.  ECF No. 30 ("Order"), available as Hawthorne v. Umpqua Bank, No. 11-cv-6700-YGR, 2012 WL 1458194 (N.D. Cal. April 26, 2012).  Judge Gonzalez Rogers subsequently entered her tentative ruling as an order by stipulation of the parties.  ECF No. 32.  Umpqua Bank answered the First Amended Complaint on May 21, 2012.  ECF No. 33.

Judge Gonzalez Rogers denied Umpqua Bank's motion as to the unfairness prong of the UCL because "no argument was offered in support of [that] request."  Order, p. 2 n. 1.  As to the fraudulent prong, the Court applied Rule 9(b)'s heightened pleading standard and sustained the UCL claim as follows:

> Plaintiffs allege that the Bank used misleading account agreements which falsely led customers to believe that overdraft fees would only be charged when there were not sufficient funds in the account to cover a debit at the time it was made.  They also allege misrepresentations regarding posting order in the Bank's account statements that hide the Bank's high-to-low posting practices.  Further, Plaintiffs allege that they have paid excessive fees and suffered damage as a result of those practices by the Bank.  These allegations give rise to at least an inference that Plaintiffs relied on the representations of the Bank and incurred excessive fees as a result.

Id. at 3.  With respect to the conversion claim, the Court held: "Plaintiffs allege that [Umpqua] has collected for itself specific and readily identifiable funds from their accounts to pay for wrongfully

collected overdraft fees and that it continues to retain these funds without their consent.  There is no indication that the Bank intends to return those funds.  These allegations are sufficient to state a claim for conversion."  Id.  The Court also sustained Plaintiffs' unjust enrichment claim as a valid California quasi-contract cause of action.  Id. p. 4 (citing Hirsch v. Bank of Am., 107 Cal. App. 4th 708, 721–22 (Cal. Ct. App. 2003).  Finally, the Court dismissed Plaintiff's unconscionability claim because "there is no ongoing enforcement of the contract terms, as Plaintiffs admit, and thus no basis for prospective declaratory relief."  Id. at 6.

Following the hearing on the instant motion, the parties stipulated to Plaintiffs' filing of the operative Second Amended Complaint, ECF Nos. 54 (Stipulation), 56 (SAC), which differs from the first only in that (1) it separates Plaintiffs' UCL claim into three separate claims, and (2) it does not assert an unconscionability claim, consistent with the Court's Order dismissing it.  The Court approved the stipulation, ECF No. 55, and Umpqua Bank answered the Second Amended Complaint on July 24, 2013, ECF No. 57.

## II.    LEGAL STANDARDS

"After the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  Analysis under Rule 12(c) motions for judgment on the pleadings is "substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy."  Chavez v. United States, 683 F.3d 1102, 1108 (9th Cir. 2012) (quotation omitted).  However, "if the pleadings do not resolve all of the factual issues in the case, a trial on the merits would be more appropriate."  Wright & Miller, 5C Fed. Prac. & Proc. Civ. § 1367 (3d ed., rev. 2013).

On a motion to dismiss, courts accept the material facts alleged in the complaint, together with all reasonable inferences to be drawn from those facts, as true.  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

United States District Court
Northern District of California

1    To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to

2    relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

3    Plausibility does not mean probability, but it requires "more than a sheer possibility that a

4    defendant has acted unlawfully." Iqbal, 556 U.S. at 687.

5    In addition, fraud claims are subject to a heightened pleading standard. "In alleging fraud

6    or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

7    Fed. R. Civ. P. 9(b). The allegations must be specific enough to give a defendant notice of the

8    particular misconduct alleged to constitute the fraud such that the defendant may defend against

9    the charge. Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985). In general, allegations

10   sounding in fraud must contain "an account of the time, place, and specific content of the false

11   representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG

12   LLP, 476 F.3d 756, 765 (9th Cir. 2007).

### III.    REQUEST FOR JUDICIAL NOTICE

14   With its Motion for Judgment on the Pleadings, Umpqua Bank seeks judicial notice of: a

15   Certificate of Amendment to the Restated Articles of Incorporation of Umpqua Bank issued by the

16   State of Oregon, ECF No. 42, Ex. A; a report issued by the Oregon Department of Consumer &

17   Business Services titled "Banks and Trusts Doing Business in Oregon," Id., Ex. B; and three items

18   from the legislative history of the Oregon Bank Act, Oregon Rev. Stat. ch. 706, including

19   legislative testimony from the Oregon Bankers Association, Id., Ex. C, a "Section by Section"

20   analysis of the Act, Id., Ex. D, and a "Staff Measure Summary" of the Act, Id., Ex. E.

21   "Generally, a district court may not consider any material beyond the pleadings in ruling

22   on a Rule 12(b)(6) motion." Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542,

23   1555 n. 19 (9th Cir. 1990). Federal Rule of Civil Procedure 12(d) provides: "If, on a motion under

24   Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the

25   court, the motion must be treated as one for summary judgment under Rule 56." However, courts

26   may properly take judicial notice of material attached to the complaint. See Lee v. City of Los

27   Angeles, 250 F.3d 668, 688–69 (9th Cir. 2001); Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir.

28

United States District Court
Northern District of California

7

1994), rev'd on other grounds by Galbraith v. Cnty. of Santa Clara, 307 F.3d 1119 (9th Cir. 2002). If the documents are not attached to the complaint, they may be considered if their authenticity is not contested and the complaint "necessarily relies on them." Lee, 250 F.3d at 688. This has become known as the "incorporation by reference" doctrine. Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005).

At the motion to dismiss stage, "'[t]he court has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion.'" Nat'l Agr. Chemicals Ass'n v. Rominger, 500 F. Supp. 465, 472 (E.D. Cal. 1980) (quoting 5 Wright & Miller, Federal Practice & Procedure, § 678 (1969)). Indeed, the incorporation by reference doctrine "is a narrow exception aimed at cases interpreting, for example, a contract. It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment." Levenstein v. Salafsky, 164 F.3d 345, 347 (7th Cir. 1998). See, e.g., Cooper v. Pickett, 137 F.3d 616, 622–23 (9th Cir. 1997) (declining to consider documents referred to but not central to plaintiff's complaint).

Here, the Court declines to consider any of the materials submitted with Umpqua's motion because they are unnecessary to resolve the motion on its merits.

## IV. ANALYSIS

### A. Preemption

Umpqua's argument that Plaintiffs' claims are preempted by federal law relies heavily on the recent opinion in Gutierrez v. Wells Fargo Bank, N.A., 704 F.3d 712 (9th Cir. 2012). In that case, the Ninth Circuit held that the National Bank Act ("NBA") preempted state law claims challenging Wells Fargo's practice of re-ordering transactions in order to maximize overdraft fees it charged to its customers. Umpqua argues that National Bank Act preemption applies here, even though Umpqua is a state-chartered bank, through application of the Federal Deposit Insurance Act. Because the Gutierrez ruling is central to Umpqua's arguments, the Court first summarizes the litigation surrounding that decision.

/ / /

United States District Court
Northern District of California

1        **1.      The <u>Gutierrez</u> overdraft fee litigation**

2        In <u>Gutierrez</u>, the class action plaintiffs asserted claims for violation of the UCL's unfair

3    and fraudulent prongs against Wells Fargo Bank based on its reordering of transactions at the end

4    of each day in descending order of amount.  <u>Gutierrez v. Wells Fargo Bank, N.A.</u>, ("<u>Gutierrez I</u>"),

5    730 F. Supp. 2d 1080, 1082 (N.D. Cal. 2010) <u>aff'd</u> <u>in</u> <u>part</u>, <u>rev'd</u> <u>in</u> <u>part</u> <u>and</u> <u>remanded</u> <u>sub</u> <u>nom.</u>

6    <u>Gutierrez v. Wells Fargo Bank, NA</u>, ("<u>Gutierrez II</u>"), 704 F.3d 712 (9th Cir. 2012).  Following a

7    two-week bench trial, Judge Alsup found that Wells Fargo had violated both the unfair and

8    fraudulent prongs of the UCL, <u>id.</u> at 1124, enjoined Wells Fargo from using a high-to-low posting

9    order, and awarded restitution to a class of California consumers of approximately $203 million.

10   <u>Id.</u> at 1137–40.

11       Judge Alsup found that Wells Fargo had violated the unfair prong of the UCL by acting in

12   bad faith when it changed its posting order to high-to-low.  In so holding, the court expressly

13   rejected the argument that high-to-low posting can be beneficial to consumers:

> [T]he bank did not act out of solicitude for customers and any
> supposed belief that customers would prefer high-to-low posting.
> That is a post-hoc rationalization.  Among other reasons, the vast
> majority of debit-card purchases are "must pay" transactions.  As
> such, posting order would make no difference to the customer — the
> bank is required to honor a debit-card purchase whether it posts first,
> last, or somewhere in between.

18   <u>Id.</u> at 1124.

19       Judge Alsup found that Wells Fargo also violated the fraudulent prong of the UCL

20   because:  (1) Wells Fargo did not disclose its re-ordering practices; (2) Wells Fargo's marketing

21   materials and online banking portal suggested that transactions post in chronological order; and

22   (3) Wells Fargo encouraged customers to use check registers to keep track of their balances,

23   emphasizing the sequential, chronological withdrawal of funds from customer accounts, even

24   though funds were not withdrawn chronologically.  <u>Id.</u> at 1129.

25       Judge Alsup rejected Wells Fargo's argument that the National Bank Act of 1864, 38

26   Cong. Ch. 106, 13 Stat. 99 (codified at 12 U.S.C. § 1, *et seq.*) ("NBA") preempted the plaintiffs'

27   UCL claim.  On appeal, the Ninth Circuit reversed that conclusion with respect to the UCL's

28

United States District Court
Northern District of California

unfair prong, noting: "We do not tackle the Unfair Competition Law generally vis-a-vis federal banking regulation.  Rather, reviewing de novo, we analyze each Unfair Competition Law claim separately . . . ."  704 F.3d at 722–23.

"Congress passed the National Bank Act to ensure that national and state banks could coexist on a basis of 'competitive equality.'"  Gutierrez II, 704 F.3d at 722.  The Act vests nationally chartered banks with broad powers, including "all such incidental powers as shall be necessary to carry on the business of banking."  12 U.S.C. § 24.  The Ninth Circuit held that those "incidental powers" include the power to decide which order nationally chartered banks use in sequencing checking account transactions.  Gutierrez II, 704 F.3d at 723.  The Ninth Circuit reversed Judge Alsup's permanent injunction against high-to-low posting because "state law can[not] dictate Wells Fargo's choice of posting method."  Id.

In so holding, the court relied on both the catch-all provision of the NBA as well as the regulations promulgated by the Office of the Comptroller of the Currency ("OCC") pursuant to 12 U.S.C. § 93a, which authorizes the OCC to define the "incidental powers" beyond those enumerated in the statute.  "[T]he OCC has determined that '[t]he establishment of non-interest charges and fees, their amounts, and *the method of calculating them* are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles.'"  Id. at 724 (original emphasis) (quoting 12 C.F.R. § 7.4002(b)(2)).  Consequently, the Ninth Circuit held, "a 'good faith' limitation applied through California's Unfair Competition Law is preempted when applied in a manner that prevents or significantly interferes with a national bank's federally authorized power to choose a posting order."  Id. at 725.

With respect to the fraudulent prong of the UCL, however, the Ninth Circuit affirmed Judge Alsup's findings because the UCL "does not impose disclosure requirements but merely prohibits statements that are likely to mislead the public.  As a non-discriminating state law of general applicability that does not 'conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties,' the Unfair Competition Law's prohibition on misleading statements under the fraudulent prong of the statute

is not preempted by the National Bank Act." Id. (quoting Bank of Am. v. City & Cnty. of San Francisco, 309 F.3d 551, 561 (9th Cir. 2002)).[1]

### 2. National Bank Act Preemption of State Law For Interstate State-Chartered Banks Through the Federal Deposit Insurance Act

Umpqua argues that the holding of Gutierrez II applies to Plaintiffs' claims here because state law is also preempted by the Federal Deposit Insurance Act ("FDIA"), Sept. 21, 1950, c. 967, § 2[1], 64 Stat. 873 (codified at 12 U.S.C. §§ 1811–1835a).  Congress enacted the FDIA to promote the stability of, and confidence in, the nation's banking system, and "to provide all banks and savings associations with the same opportunity to obtain and enjoy the benefits" of the Act. 12 U.S.C. § 1830.

The provision most relevant here, 12 U.S.C. § 1831a(j), was first enacted as part of the Riegle–Neal Interstate Banking and Branching Efficiency Act of 1994 ("IBBEA"), Pub. L. No. 103–328, 108 Stat. 2338 (1994), which established, for the first time, a federal scheme for interstate branching by state and national banks.  That Act provided, with respect to the application of state law to interstate branches of out-of-state nationally chartered banks: "The laws of the host State regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches shall apply to any branch in the host State of an out-of-State national bank to the same extent as such State laws apply to a branch of a bank chartered by that State, except," among other instances, "(i) when Federal law preempts the application of such State laws to a national bank." 12 U.S.C. § 36(f)(1)(A).

With respect to interstate branches of state-chartered banks, the IBBEA added 12 U.S.C. §1831a, subsection (j), which then read in relevant part: "The laws of a host State, including laws regarding community reinvestment, consumer protection, fair lending, and establishment of

---

[1] On remand, Judge Alsup reinstated the award of restitution pursuant to his finding that Wells Fargo violated the fraudulent prong of the UCL.  Gutierrez v. Wells Fargo Bank, N.A., ("Gutierrez III") No. 07-cv-05923-WHA, 2013 WL 2048030, at *8, --- F.Supp.2d ---- (N.D. Cal. May 14, 2013).  Judge Alsup also permanently enjoined Wells Fargo "from making or disseminating, or permitting to be made or disseminated, any false or misleading representations relating to the posting order of debit-card purchases, checks, and ACH transactions in its customer bank accounts." Id. at *11.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   intrastate branches, shall apply to any branch in the host State of an out-of-State State bank to the

2   same extent as such State laws apply *to a branch of a bank chartered by that State*." (emphasis

3   added). Thus, as the Act stood after the 1994 amendments, interstate branches of national banks

4   could benefit from federal preemption while interstate branches of state-chartered banks could not.

5        The Riegle–Neal Amendments Act of 1997, Pub. L. No. 105–24, 111 Stat. 238 (1997),

6   amended subsection (j) "to clarify the applicability of host State laws to any branch in such State

7   of an out-of-State bank." The 1997 amendments provided that the laws of a host state apply to

8   branches of out-of-state banks "to the same extent as such State laws apply *to a branch in the host*

9   *State of an out-of-State national bank*. To the extent host State law is inapplicable to a branch of

10  an out-of-State State bank in such host State pursuant to the preceding sentence, home State law

11  shall apply to such branch." 12 U.S.C. § 1831a(j)(1) (emphasis added).

12       Umpqua Bank argues that § 1831a(j), as amended, is a "parity provision" that applies

13  federal preemption of state law to interstate branches of state-chartered banks. Plaintiffs make

14  several arguments against federal preemption.

15       The first is that a state law can be "unenforceable" due to federal preemption while still

16  being "applicable" to the banks against which the statute cannot be enforced. The Court is not

17  persuaded by this argument, which "violates basic principles of statutory construction." Pereira v.

18  Regions Bank, No. 6:12-CV-1383-ORL, 2013 WL 265314, at *3 (M.D. Fla. Jan. 2, 2013).

19       In Pereira, the plaintiff class asserted claims for (1) violation of Florida Statute § 655.85,

20  which prohibits settling a check for less than its value — or less than "par" — and (2) unjust

21  enrichment against Regions Bank based on its practice of charging fees to cash checks. Id. The

22  Eleventh Circuit had previously held that the National Bank Act preempts the par value statute.

23  Baptista v. JP Morgan Chase Bank, N.A., 640 F.3d 1194, 1198 (11th Cir. 2011). Regions Bank,

24  an Alabama-chartered bank, argued that the 1997 amendments to the FDIA provided for

25  preemption of the plaintiffs' claims and required the application of Alabama law since the Florida

26  par value statute had been preempted. The Pereira court agreed. Id.; see also Wells Fargo Bank of

27  Tex., N.A. v. James, 321 F.3d 488, 490 n.1 (5th Cir. 2003) (noting without comment that the

28

defendants were "state-chartered banks which, for the purpose of this appeal, enjoy the same preemption rights as national banks pursuant to the Federal Deposit Insurance Act, 12 U.S.C. § 1831a(j)(1), and the Texas Constitution art. 16, § 16(c).").

Plaintiffs further argue that "the parity provision merely provides that the host-state laws apply to branches of out of state bank branches in those host states." ECF No. 45 p. 4. That reading of the statute ignores the sentence added as part of the 1997 amendments addressing which law applies when the host state's law is "inapplicable" because it is preempted by federal banking law. 12 U.S.C. § 1831a(j)(1). The only fair reading of that additional sentence is that the bank's home state law applies.

As noted in Pereira, the legislative history of the FDIA also supports this interpretation. The bill's sponsor expressed that the purpose of the bill was "to provide parity between State-chartered banks and national banks." Rep. Roukema, 1997 WL 267919, 143 Cong. Rec. H3088-02 (May 21, 1997). She characterized the amendment as "recognize[ing] the importance of host State laws by requiring all out-of-State banks to comply with host State laws . . . *unless the State law has been preempted by national banks*. In that instance the law of the State which issued the charter will prevail." Id. (emphasis added). Supporters of the bill agreed. See Rep. Vento, 143 Cong. Rec. H3088-02, 1997 WL 267919 (May 21, 1997) ("Only under the limited circumstances in which the Comptroller preempts host State laws for national banks will out-of-State State-chartered banks similarly be exempted from the laws of the host State. In those cases, the out-of-State bank will be required to follow its own home State laws as regards such activity."); Rep. Sarbanes, 143 Cong. Rec. S5637-01, 1997 WL 314303 (June 12, 1997) (proposing amendment: "H.R. 1306 would expand the applicability of [OCC] preemption decisions to branches of out-of-State State banks. Given this significant expansion of the consequences of the Comptroller's preemption decisions, it seems reasonable and important to require the Comptroller to include in its annual report to Congress a review and explanation of these decisions.").

The Federal Deposit Insurance Corporation interprets 12 U.S.C. § 1831(j) similarly. See FDIC General Counsel's Opinion No. 11, Interest Charges by Interstate State Banks, Dec. 3, 2009,

United States District Court
Northern District of California

United States District Court
Northern District of California

available at http://fdic.gov/regulations/laws/rules/5500-800.html ("If the laws of the host state would be inapplicable to a branch of an out-of-state national bank they are equally inapplicable to a branch of an out-of-state State bank and the home state law will generally apply to the branch of an out-of-state State bank.").[2]

Courts have arrived at the same conclusion when evaluating a similar provision contained in OCC regulations.  In <u>Wells Fargo Bank N.A. v. Boutris</u>, 419 F.3d 949, 957 (9th Cir. 2005), the Ninth Circuit considered 12 C.F.R. § 7.4006, which states: "Unless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank."  The court held that the California Residential Mortgage Lending Act was preempted as to national bank operating subsidiaries "to the same extent" as it was against the national bank parents because "the principle is symmetrical: Operating subsidiaries are subject to no less *and* no more governmental regulation, state and federal, than national banks."  <u>Id.</u>  The Supreme Court reached the same conclusion with respect to Michigan's registration and inspection requirements for real estate lenders in <u>Watters v. Wachovia Bank, N.A.</u>, <u>supra</u>, 550 U.S. at 9.  The results in <u>Boutris</u> and <u>Watters</u> are instructive, as the provision those decisions interpreted is substantially similar to the parity provision at issue here.

Insofar as Plaintiffs' UCL claims would be preempted by the National Bank Act, they are preempted by the FDIA.  As for Plaintiffs' common law claims, Defendant argues, and Plaintiffs do not dispute, that the Oregon Bank Act vests Oregon-chartered banks with the same rights and privileges as national banks, including the benefit of federal preemption.  Oregon Rev. Statutes § 708A.010(1)(a) (Oregon commercial banks and their subsidiaries are authorized to "[e]ngage as

---

[2] "[FDIC] interpretive letters, though lacking precedential value, provide general guidance as to the FDIC's position regarding Internet payment systems."  Thomas P. Vartanian, et. al., <u>A Survey of Selected Federal Regulatory and Legal Developments in Electronic Financial Services</u>, 53 Bus. Law. 251, 260 (1997) (footnote omitted).  In <u>Gutierrez</u>, the Ninth Circuit considered letters of the Office of the Comptroller of the Currency in determining what effect should be given to OCC regulations.  <u>Gutierrez v. Wells Fargo Bank, NA</u>, 704 F.3d 712, 724 (9th Cir. 2012).

principal in those activities in which national banks may engage as principal and acquire and retain those investments that national banks may acquire and retain, subject to conditions and restrictions that apply to national banks.").  Thus, to the extent those claims would be federally preempted by the National Bank Act, they also must be dismissed and judgment on them entered in favor of Defendant.

Having established that the Court will apply the parity provision as Umpqua interprets it, the Court now turns to the question of whether Plaintiffs' individual causes of action are preempted.

### B.     UCL Claims

The UCL makes actionable any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  The unlawful, unfair, and fraudulent prongs of a UCL claim are analyzed separately.  Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 179 (Cal. 1999); see also Gutierrez II, 704 F.3d at 725 (each of the three Unfair Competition Law prongs constitutes a separate and independent cause of action).  As previously noted, the Ninth Circuit held that the plaintiffs' "unfair" claims under the UCL were preempted, 704 F.3d at 725, but their "fraudulent" claims under that statute were not.  704 F.3d at 726.  Plaintiffs here argue that all of their claims fall under either the "fraudulent" or "unlawful" prongs of the UCL such that none of them are preempted.

#### 1.     Fraudulent Prong

Although Defendants acknowledge that claims for violation of the "fraudulent" prong of the UCL are not preempted, they still seek judgment on the pleadings "to the extent that Plaintiffs' fraudulent prong UCL claim was based on allegations that Umpqua failed adequately to disclose its practices, which is consistent with Gutierrez."  The request appears to have been mooted by the parties' stipulation permitting Plaintiff to amend her complaint to allege separate violations of each prong of the UCL.  The Court addresses each of the other two prongs below.

Consistent with the holding in Gutierrez, the Court denies Defendants' motion as to the "fraudulent" prong of the UCL, and finds that that claim is not preempted.

United States District Court
Northern District of California

### 2.      Unlawful Prong

Plaintiffs base their claim for violation of the unlawful prong on Umpqua Bank's alleged violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770.  Like the UCL, the CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices," provided the challenged conduct is undertaken by a person "in a transaction intended to result or which results in the sale or lease of goods or services" to a consumer.  Id.  In particular, Plaintiffs allege that Umpqua Bank violated the CLRA's prohibition on inserting unconscionable provisions in contracts, id. § 1770(a)(19), representing that goods or services have characteristics or benefits that they do not have, id. § 1770(a)(5), representing that a transaction confers or involves rights remedies, or obligations that it does not have, id. § 1770(a)(14), and passing goods or services off as those of another, id. § 1770(a)(1).  Plaintiffs now only assert those provisions that prohibit misrepresentations, since those challenging the re-ordering of transactions itself are preempted.

The CLRA defines "goods," in relevant part, as "tangible chattels bought or leased for use primarily for personal, family, or household purposes."  Cal. Civ. Code § 1761(a).  "Services" are defined as "work, labor, and services for other than a commercial business use, including services furnished in connection with the sale or repair of goods."  Id. § 1761(b).  Finally, "consumer" is defined as "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes."  Id. § 1761(d).

Keying on these definitions and the legislature's removal of the words "money" and "credit" from the definition of "consumer" in the phrase "by purchase or lease, any goods, services, money, or credit" prior to the enactment of the CLRA, several courts have held that the CLRA does not apply to credit card agreements or loans.  See Berry v. American Exp. Publishing, Inc., 147 Cal. App. 4th 224, 233 (Cal. Ct. App., 2007) (citing Assem. Bill No. 292 (1970 Reg. Sess.) Jan. 21, 1970)).  Relying on Berry, the district court overseeing the multidistrict overdraft litigation held that the plaintiffs could not assert CLRA claims because "overdrafts and overdraft fees do not fall within the California CLRA's definition of a 'good' or 'service.'"  In re Checking Account Overdraft Litig., 694 F. Supp. 2d 1302, 1326 (S.D. Fla. 2010).  In Gutierrez, Judge Alsup

16

granted summary judgment in favor of Wells Fargo on the plaintiffs' CLRA claim as follows:

> Plaintiffs have not identified the purported good or service here. Indeed, plaintiffs likely bought goods and services in many instances with the money extended because of overdrafts. But not from the bank. Much like credit cards provide an extension of credit, an overdraft provides an extension of money. Plaintiffs cite no authority showing that the bank's action was undertaken "in a transaction intended to result or which results in the sale or lease of goods or services."

Gutierrez v. Wells Fargo & Co., 622 F. Supp. 946, 957 (N.D. Cal. 2009) (quoting Cal. Civ. Code § 1770). Apart from those two decisions, the parties do not point to any decision considering whether the CLRA applies to overdraft fee challenges.[3]

This Court is not persuaded by either Gutierrez I or In re Checking Account Overdraft,[4] and now holds that debit cards are a "service" for purposes of the CLRA. Three considerations compel this conclusion.

First, the CLRA must be "liberally construed." Cal. Civ.Code § 1760. Second, as a colleague court has observed, "California courts generally find financial transactions to be subject to the CLRA." Knox, 2005 WL 1910927, at *4. Third, describing debit cards as a "service" is consistent with the benefits consumers actually receive. The relationship between Umpqua Bank and its customers is not simply a checking account relationship,[5] and it certainly is not limited

---

[3] Defendant's position that courts uniformly find the CLRA inapplicable in the context of lending agreements is overstated. In Hernandez v. Hilltop Fin. Mortgage, Inc., 622 F. Supp. 2d 842, 851 (N.D. Cal. 2007), Judge Illston rejected the reasoning in Berry as unpersuasive, concluding instead that the California Supreme Court would find that the CLRA applied to services related to the mortgage loans challenged in that case. See also Jefferson v. Chase Home Fin. LLC, No. 06-cv-6510-TEH, 2007 WL 1302984, at *3 (N.D. Cal. May 3, 2007) (mortgage finance transaction involved "more than the provision of a loan; they also include [the] financial services [of managing the loan]"); Knox v. Ameriquest Mortg. Co., No. 05-cv-00240, 2005 WL 1910927, at *4 (N.D. Cal. Aug. 10, 2005) (predatory lending allegations were subject to the CLRA); In re Ameriquest Mortg. Co., No 05-CV-7097, 2007 WL 1202544, at *6 (N.D. Ill. Apr. 23, 2007) (services tangential to mortgage loan could establish CLRA claim).

[4] That court merely described the issue as whether the payment of overdrafts was a service and said it was not, without further analysis. In re Checking Account Overdraft Litig., 694 F. Supp. 2d 1302, 1326-27 (S.D. Fla. 2010). See also Jefferson, supra, n.3 (declining to rely on a prior court's opinion that "provided no analysis before reaching its conclusion that the CLRA did not apply").

[5] The Court does not decide today whether a checking account without a debit card feature would

solely to the imposition of overdraft fees.  Rather, the debit card relationship is best understood as encompassing convenience services that go beyond those associated with a simple checking account.  See Hitz v. First Interstate Bank, 38 Cal. App. 4th 274, 286 (1995).  Hitz involved credit cards, not debit cards, but in a passage that applies equally well to both, that court wrote:

> The convenience feature of credit cards is surely a "service" within the meaning of Civil Code section 1671, subdivision (c), wholly apart from the credit feature. Observers of the banking industry view the convenience feature as such; the publications quoted above both include references to "credit card services."  A credit card user enjoys various benefits *other than borrowing* — primarily cashless and checkless purchasing — regardless of whether the credit feature is used. Indeed, convenience use without borrowing is the "reason that some banks levy a flat charge on the use of the card."  Thus, some users even *pay* for these two features separately: their annual charge for the card is attributable to the convenience feature, while they pay for use of the credit feature through finance charges.

Id. at 287 (emphasis in original) (citations and footnote omitted).  Thus, although Hitz involved credit cards that allowed consumers to borrow money, the Hitz court was clear that the "convenience services" provided by the card came from the use of the card medium itself — a conclusion that applies equally well here.

The Court finds that Umpqua Bank's debit card constitutes a "service" under the CLRA. Defendant's Motion for Judgment on the Pleadings on Plaintiff's claim for violation of the "unlawful" prong of the UCL must therefore be denied.

### 3.    Unfair Prong

Defendant argues that Plaintiffs' claim for violation of the "unfair" UCL prong is also preempted, because it is no different than the unfairness claim in Gutierrez I.  Plaintiffs argue that the alleged unfairness here is based on affirmative misrepresentations, such that the holding of Gutierrez II does not apply.

An unfair business practice under the UCL is "one that either offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."  McDonald v. Coldwell Banker, 543 F.3d 498, 506 (9th Cir. 2008) (omitting internal

---

constitute a "service" for purposes of the CLRA.

1    citations).  "Determination of whether a business practice or act is 'unfair' within the meaning of

2    [section 17200] entails examination of the impact of the practice or act on its victim, balanced

3    against the reasons, justifications and motives of the alleged wrongdoer.  In brief, the court must

4    weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim.

5    In general the 'unfairness' prong 'has been used to enjoin deceptive or sharp practices.'"  Wilson v.

6    Hynek, 207 Cal. App. 4th 999, 1008 (Cal. Ct. App. 2012) (ellipses, citations, and quotations

7    omitted).

8          As the California Supreme Court recently noted, "[t]he standard for determining what

9    business acts or practices are "unfair" in consumer actions under the UCL is currently unsettled."

10   Yanting Zhang v. Superior Court, 57 Cal. 4th 364, 380 n. 9 (2013).  One test holds that "an

11   'unfair' business practice occurs when it offends an established public policy or when the practice

12   is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  People

13   v. Casa Blanca Convalescent Homes, Inc., 159 Cal. App. 3d 509, 530 (1984).  Another test

14   requires that a plaintiff prove "that the defendant's "conduct is tethered to an . . . underlying

15   constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an

16   antitrust law, or violates the policy or spirit of an antitrust law."  Byars v. SCME Mortgage

17   Bankers, Inc., 109 Cal. App. 4th 1134, 1147 (Cal. Ct. App. 2003).  A third test requires that "(1)

18   the consumer injury must be substantial; (2) the injury must not be outweighed by any

19   countervailing benefits to consumers or competition; and (3) it must be an injury that consumers

20   themselves could not reasonably have avoided."  Drum v. San Fernando Valley Bar Ass'n, 182

21   Cal. App. 4th 247, 257, (Cal. Ct. App. 2010).  While recognizing that section 17200's "coverage is

22   sweeping," Gutierrez II, 704 F.3d 712 n. 2, the Ninth Circuit determined that plaintiffs' claim

23   under the "unfair" prong of the UCL was preempted without deciding which of these tests to

24   apply.  Gutierrez II, 704 F.3d at 717 n. 3.

25         Plaintiffs do not address this split in California authority.  They merely argue that

26   "Plaintiffs have alleged a claim that is not preempted, because they claim that Umpqua's

27   misrepresentations are immoral, unethical, oppressive, unscrupulous, or substantially injurious to

28

United States District Court
Northern District of California

consumers." ECF No. 45 at 13. The Court concludes that this argument is insufficient to take the present case out of Gutierrez II's core holding: that claims regarding transaction ordering are preempted when they arise under the UCL's "unfair" prong. In Gutierrez II, the plaintiffs had tethered their claim to a California Commercial Code requirement that a bank "act in good faith" and not "for the sole purpose of increasing the amount of returned check fees charged to the customer." Gutierrez II, 704 F.3d at 717. Plaintiff's argument here, reduced to its essence, is that Umpqua did not act in good faith and that it acted for the sole purpose of increasing overdraft fees. Accordingly, because Plaintiff's claim here is similar to the one at issue in Gutierrez II, and because Plaintiff makes no serious effort to distinguish it, the Court finds that Plaintiff's claims under the "unfair" prong of the UCL are preempted.

**C.     Breach of the Covenant of Good Faith and Fair Dealing**

Plaintiffs attempt to save their good faith and fair dealing claim by arguing that Gutierrez II only preempted state laws "*directed at* banks that interfere with pricing decisions." ECF No. 45 p. 16. State laws of general applicability, Plaintiffs argue, are never preempted. In particular, Plaintiffs argue that their good faith claim "merely demands that Umpqua, like every other contracting party in California, be required to exercise contractual discretion in good faith." Id.

Plaintiffs' argument is expressly foreclosed by the Ninth Circuit's decision. The Gutierrez II court held that "California's Unfair Competition Law is preempted when *applied* in a manner that prevents or significantly interferes with a national bank's federally authorized power to choose a posting order." 704 F.3d at 725 (emphasis added). The UCL itself is a law of general applicability, and it is preempted when *applied* in a manner that interferes with the National Bank Act. The focus is not on whether a particular state law is "directed at" banks, but rather whether, when applied, the law runs afoul of federal law.

Plaintiffs also argue that their good faith claim does not interfere with Umpqua's ability to choose a posting order, but restricts Umpqua's ability to make those decisions in bad faith. The Ninth Circuit rejected that argument as well. Id. at 724 ("'[t]he establishment of non-interest charges and fees, their amounts, and *the method of calculating them* are business decisions to be

United States District Court
Northern District of California

made by each bank, *in its discretion*, according to sound banking judgment and safe and sound banking principles.'"  Id. at 724 (emphasis added) (quoting 12 C.F.R. § 7.4002(b)(2)).  Simply put, the Ninth Circuit held that "a 'good faith' limitation applied through California's Unfair Competition Law is preempted" when it is asserted as Plaintiffs have done here.  Id. at 725.  Their implied covenant of good faith claim is no different; indeed, Plaintiffs do not attempt to distinguish their good faith claim from the one evaluated by the Gutierrez II court.  Nor do Plaintiffs point to any decision that supports their position, apart from the decision in White v. Wachovia Bank, N.A., 563 F. Supp. 2d 1358, 1363 (N.D. Ga. 2008), in which the defendant appears not to have asserted a preemption defense with respect to the good faith claim.

The covenant of good faith and fair dealing would impose liability on Umpqua Bank for exercising its discretion to re-order transactions granted by its account agreements in bad faith; that would run afoul of the Gutierrez II decision with respect to nationally chartered banks, and therefore with respect to Umpqua Bank via the FDIA.  Plaintiffs' good faith claim must therefore be dismissed, and judgment entered on it in favor of Defendant.

### D.    Breach of Contract

Plaintiffs argue, without explanation or citation to authority, that the misrepresentations challenged by the SAC "provide the basis for a breach of express contract claim."  ECF No. 45 pp. 18–19.  The Court disagrees.  Defendant correctly argues that the contracts at issue expressly granted Umpqua Bank the discretion to post transactions high-to-low, and, indeed, sometimes disclosed that Umpqua Bank would do so.  Plaintiffs fail to identify any term of the contracts at issue that they allege Umpqua breached.  Their claim for breach of contract must therefore be dismissed, and judgment entered on it in favor of Defendant.

### E.    Conversion

In its reply in support of the instant motion, Umpqua Bank concedes that Plaintiffs' claim for conversion may "be accomplished through 'fraud.'"  ECF No. 48 p. 9 ("Umpqua assumes Plaintiffs contend that a conversion can occur when the plaintiff was tricked into parting with possession of his or her property because of a misrepresentation.  That may be so . . . .").

Strangely, Umpqua argues that, even still, Plaintiffs fail adequately to allege "that they deposited funds with Umpqua which were used to pay overdraft fees." Id. But the SAC expressly alleges just that: "Umpqua has wrongfully collected overdraft fees from Plaintiffs and the members of the National Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them." SAC ¶ 104. The claim is therefore not at issue, and Defendant's Motion for Judgment on the Pleadings on Plaintiffs' conversion claim must be denied.

### F.    Unjust Enrichment

In denying Umpqua Bank's motion to dismiss Plaintiffs' unjust enrichment claim, Judge Gonzalez Rogers relied on the decision in Hirsch v. Bank of Am., 107 Cal. App. 4th 708, 721–22, (Cal. Ct. App. 2003), in which the California court held valid a plaintiff's unjust enrichment claim based on the bank's "unjustified charging and retention of excessive fees." Defendant now argues that Gutierrez II preempts the unjust enrichment claim insofar as it is premised on the re-ordering of transactions. The Court agrees, for the reasons explained above. That leaves only Plaintiffs' argument that they may assert an unjust enrichment claim based on Umpqua Bank's misleading statements. They may not. Though the unjustified charging of excessive fees considered in Hirsch may have given rise to unjust enrichment liability on an alternative quasi-contract theory, no such theory exists with respect to Umpqua's allegedly misleading statements, and the general rule in California is that "[u]njust enrichment is not a cause of action, just a restitution claim." Hill v. Roll Int'l Corp., 195 Cal. App. 4th 1295, 1307 (Cal. Ct. App. 2011). Plaintiffs' unjust enrichment claim must therefore be dismissed, and judgment entered on it in favor of Defendant.

## V.    CONCLUSION

For the foregoing reasons, the Court hereby ORDERS as follows:

1.    Defendant's Motion for Judgment on the Pleadings is GRANTED with respect to Plaintiffs' claims for violation of the "unfair" prong of the UCL, breach of the implied covenant of good faith and fair dealing, breach of contract, and unjust enrichment, and those claims are DISMISSED with prejudice.

2.      Defendant's Motion for Judgment on the Pleadings is DENIED in all other respects.

**IT IS SO ORDERED**.

Dated: October 25, 2013



_____
JON S. TIGAR
United States District Judge